## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE DHB INDUSTRIES, INC. DERIVATIVE LIGITATION<br><br>_____<br><br>This Document Relates To:<br><br>ALL ACTIONS.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. CV-05-4345 (JS) (ETB) |

## <u>VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT AND JURY DEMAND</u>

Plaintiff, by his attorneys, submits this Verified Consolidated Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

### SUMMARY OF THE ACTION

1.     This is a shareholder derivative action brought by shareholders of DHB Industries, Inc. ("DHB" or the "Company"), on behalf of the Company against certain of its officers, its directors and related third parties seeking to remedy defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and aiding and abetting breach of fiduciary duty that have caused substantial losses to DHB and other damages, such as to its reputation and goodwill.

2.     DHB is comprised of two divisions: DHB Armor Group and DHB Sports Group. DHB Armor Group consists of Point Blank Body Armor, Inc. ("Point Blank") and Protective Apparel Corporation of America ("PACA"), engaged in the development, manufacturing and distribution of advanced bullet and projectile resistant garments, bullet resistant and fragmentation vests, bomb projectile blankets, and related ballistic accessories and technologies for the United States Military and Law Enforcement Agencies. DHB Armor Group accounts for 98% of DHB's revenues.

3.     DHB was founded by defendant David H. Brooks ("Brooks") and share his initials. Brooks is often referred to as a "War Profiteer" and has a history of engaging in illegal activity. Brooks and his brother Jeffrey Brooks were implicated by the SEC in an insider trading scheme as well as aiding and abetting reporting violations at Jeffrey Brooks Securities, Inc. – over which Brooks exerted *de facto* control.

4.     Defendant Brooks' sordid history has also effected DHB which he formed around the same time as the SEC enforcement action against him.  In 1994, the National Association of Securities Dealers ("NASD") denied DHB's application to include the Company's Nasdaq SmallCap Market, in part, because of defendant Brooks' history of securities laws violations.  In March 1995, the NASD Hearing Review Committee affirmed the decision finding that "given the extremely serious nature of the SEC allegations made against defendant Brooks, and the fact that he was only recently enjoined" that the decision was "necessary to protect investors and the public interest and to maintain public confidence."  In denying the appeal of the decision, the SEC held that "the NASD's concerns as to Brooks are legitimate" and Brooks' "conduct undermines both the regulation of securities firms and its registered representative, and the protection of investors."

5.     In 1998, the NASD agreed to list DHB on the Nasdaq SmallCap Market, but placed significant restrictions on Brooks, requiring him to resign as CEO and take on a Co-Chairman for two years.  The replacement CEO quit after only weeks on the job because he had concerns about defendant Brooks' integrity and his unwillingness to actually relinquish control of DHB's day-to-day operations.  Nasdaq also required David and Jeffrey Brooks to implement several measures to prevent a repeat of their past misconduct.

6.     None of this, however, stopped defendant Brooks from using DHB to enrich himself and his family through a myriad of self dealing transactions all at the expense of the Company.  For

example, defendant Brooks has used DHB to buy and then later shutdown another company to gain equipment that was later given to his wife's company to make products to sell to DHB that are made in DHB's own facilities.  Making it even worse, defendant Brooks also made money on the purchase of the other company as it was financed by a loan from Brooks to DHB at excessive interest rates. The SEC is currently investigating defendant Brooks' related party transactions.

7.     As a result of defendant Brooks pilfering of the Company's funds and limited demand for body armor, DHB remained a fairly small company through 2001.  Following the national tragedy of September 11th and the resulting foreign wars and/or foreign conflicts, however, the demand for body armor products to protect domestic law enforcement agencies and United States military personnel expanded immensely.  While the rising demand in security based companies provided DHB with an excellent opportunity for growth, defendants acted to benefit themselves at the expense of DHB instead by artificially inflating DHB's value.

8.     DHB started reporting large supply contracts with domestic law enforcement agencies as well as the U.S. military and record growth in profits, supposedly due to soaring sales fueled by the reportedly high quality of DHB's products.  ***DHB's products were continually referred to as exceeding customer requirements and expectations and DHB continued to forecast strong profitable growth***.  Contrary to defendant's continual assurances of product quality, DHB's vests suffered from material quality problems and DHB's Tactical Interceptor vests continually failed to meet military contract specifications.

9.     The defendants were fully aware of the serious quality issue with DHB's vests.  For example, one of the raw materials used to manufacture many of DHB's domestic law enforcement bulletproof vests was synthetic PBO (poly p-phenylene-2, 6-benzobisoxazole) fiber, commonly referred to as "Zylon®," the sole manufacturer of which is Toyobo Companies Ltd. ("Toyobo").  As

early as 1998, Toyobo revealed information that Zylon® fabric degraded substantially faster than expected, especially when exposed to sunlight, fluorescent light, elevated temperatures and humidity. This information was shared with customers such as DHB via multiple communication channels and industry meetings.  Despite this growing evidence, DHB continued to manufacture and sell Zylon® bulletproof vests with Zylon® provided by Toyobo.  Later in 2002 and 2003, confirmation of the deficiencies in Zylon® was substantiated with additional tests done by Toyobo and communicated to customers in quarterly updates and manufacturers' meetings.  Despite knowledge of Zylon®'s deficiencies, defendants continually disseminated false and misleading information regarding the quality of its products and business prospects, and increased the sales and distribution of products containing Zylon®.

      10.     Defendants were also aware of serious quality problems with DHB's Interceptor vests. The military, however, had little or no choice but to accept shipments of these vests out of urgency for U.S. soldiers fighting in foreign wars.  A *Marine Corps Times* article titled, "The Marines' flawed body armor," detailed how DHB had shipped thousands of defective and non-conforming "***Tactical Interceptor***" vests to the Marines with "***critical***, ***life-threatening flaws in the vests***," which the Marines had been forced to recall.  This article documented that military ballistics experts and the Defense Contract Management Agency had identified thousands of defective DHB vests dating back to 2003.  These officials recommended disciplinary action against DHB and rejection of these vests due to "***major quality assurance deficiencies***."  One military ballistic test facilitator stated on August 24, 2004, that "***[b]ased on ballistic test data and previously identified quality assurance failures***, ***I do not recommend acceptance of these lots until this issue is resolved***."  The *Marine Times* article also explained that DHB officials had signed numerous waivers throughout 2004 so that the military could accept vests that did not meet government specifications.

11.     Instead of fixing the quality problems at DHB, the defendants made false and misleading statements regarding product quality and business prospects of the Company's bullet resistant body armor products and related contracts in order to cash in on millions of dollars in DHB stock.  The defendants also caused or allowed DHB to sell bullet resistant body armor, which they knew contained material deficiencies, thus endangering the lives of the end users.  After building customer confidence and aware that massive quality problems could not stay hidden much longer, the entire board at the time as well as the CFO executed a massive insider sell-off.

12.     *On November 30*, *2004*, *DHB's COO Hatfield signed a waiver constructively acknowledging that DHB vests failed to meet the Marine Corp's minimum test standards*.  (Exhibit A, referred to herein as "Hatfield's Waiver" or the "Waiver").  *On the day before and on the day of Hatfield's Waiver*, DHB's insider executive officers and the entire Board collectively sold over *$83 million* in Company stock as DHB stock was at its then all time high.  The insider sellers, however, did not stop at $83 million.  Contemporaneous with the announcement of the largest military body armor contract in history and a large contract with the City of Baltimore, Maryland on December 23, 2004, Brooks and Hatfield collectively sold over $117 million more, bringing the defendants collective grand total to a whopping $201,304,532 as DHB stock reached its all time high.  These massive sales were the first ever sales by all but one of the insider sellers.  In total, between November 29, 2004 and December 29, 2004, *in a span of one month*, defendants David H. Brooks ("Brooks"), Hatfield, Dawn M. Schlegel ("Schlegel"), Jerome Krantz ("Krantz"), Gary Nadelman ("Nadelman"), Gary Chasin ("Chasin") and Barry Berkman ("Berkman") *sold of 10,288,789 million shares of DHB yielding over $201 million*.  In comparison, *before the sales in late 2004*, *only one of the defendants had any stock sales dating back to 1998*.  From the beginning of their respective employment periods and/or inception as directors with DHB starting as early as 1998, through

November 29, 2004, *Hatfield*, *Schlegel*, *Krantz*, *Nadelman*, *Chasin and Berkman had no stock sales*, compared to the four weeks following November 29, 2004 when these individuals collectively sold $15,410,779 in Company stock.[1] *Defendant Brooks was the only insider with any sales from 1998 to November 29*, *2004*, which totaled approximately $26,675,933, however these numbers pale in comparison to his sales in the four weeks starting November 29, 2004.[2] *Between November 29*, *2004 and December 29*, *2004*, *Brooks sold $185,893,750 in Company stock*, *which represented approximately 70% of all his historical Company Stock sales*.  These defendants collectively sold over 10 million shares of Company held stock within weeks of when DHB stock hit an all-time high of over $20.  These sales represented 22% of DHB's then outstanding shares.

13.     Only days after the insider bail out, DHB was sued by the Southern States Police Benevolent Association over its sales of vests containing Zylon®.  Following this lawsuit and on the heels of the defendants' insider sales, DHB stock began a downward spiral.  DHB stock steadily declined after the insider sell-out to below $3 per share in October, 2005 and currently, currently trades at around $5 dollars per share.  *(Not represented in the graph below are defendant Brooks' stock sales on 11/14/03 and 12/11/03)*

_____

[1]  Defendants Schlegel and Krantz have been directors since at least FY:00; defendant Hatfield has been Chief Operating Officer since at least FY:00; defendant Nadelman has been a director since FY:01; defendant Chasin has been a director since FY:02 and defendant Berkman has been a director since FY:03.

[2]  In addition, the $26 million in Company stock sales defendant Brooks had before November 29, 2004, occurred on November 14, 2003 and December 11, 2003, at a time when the degradation problems associated with Zylon were known or should have been known by defendant Brooks.



14.     *Even before defendant Hatfield signed the Waiver, there were multiple red flags concerning deficiencies in DHB's domestic law enforcement vest products containing Zylon®, including reports, communications and meetings from Toyobo (Zylon®'s manufacturer) as well as the repeated failures of DHB's Interceptor Vests to meet Marine Corps contract specifications. Hatfield's November 30, 2004 Waiver is significant, however, for many reasons: (i) defendant Hatfield's Waiver operated as constructive acknowledgement of problems associated with DHB bullet resistant vest durability and degradation, of which the Board of Directors (the "Board") knew or should have known; (ii) the insider sales by defendants Hatfield, Berkman, Chasin, Nadelman, Krantz and Schlegel, on November 29, 2004 and November 30, 2004 (the day before and the day of Hatfield's signed Waiver) yielded over $13.6 million worth of Company stock, compared with*

*collectively never having sold Company stock before these dates*; (iii) *defendant Hatfield's Waiver was not reported in any Securities and Exchange Commission ("SEC") filings on or surrounding the insider sales*; (iv) *defendant Hatfield*, *who signed the military Waiver on November 30*, *2004*, *had over $3.5 million in Company stock sales just one day before*; (v) after the insider sales at the end of FY:04 (that were timed perfectly with the non-disclosed waiver), the Marine Corps "stopped taking delivery of Point Blank manufactured vests in early 2005" even though "the contract had not been exhausted"; (vi) DHB was sued by the Southern States Police Benevolent Association and seven Ohio Highway Patrol officers for selling defective bullet-resistant vests only weeks later; and (viii) *DHB's value has declined over 77% since December 29*, *2004*.

15.     On August 30, 2005, the truth regarding the Company's material omissions and misstatements was revealed when the defendants caused or allowed DHB to issue a press release announcing that it *had discontinued the use of Zylon® in its bullet resistant products due to the National Institute of Justice's ("NIJ") decision to revoke the NIJ's previously issued certifications of all vests containing Zylon® in the marketplace*.  As defendants undoubtedly knew Zylon® fiber loses a lot of its projectile-stopping potency as it ages and breaks down, the Board was on notice of potential problems regarding the effectiveness and durability of DHB's domestic law enforcement products containing Zylon® through multiple communication channels from Toyobo.  The Board was also on notice of problems regarding the effectiveness of DHB's Interceptor vests from repeated military test failures and being required to sign waivers based on the failures even before Hatfield's November 30, 2004 Waiver.

16.     Following the August 30, 2005 press release, the Company's market capitalization was devastated by over 24% as its share price fell from $6.66 to $5.10 per share, a far cry from the all-time

high share price of over $20 at which certain of the defendants sold over 10 million of their personal shares to reap proceeds of over $201 million.

17.     As a result of the discontinued sales of Zylon® based vests and prospects in 3Q:05, DHB had to record $60 million charge to write down its Zylon® inventory and replace its Zylon® containing bullet-resistant products.  These charges are material and display a violation in Generally Accepted Accounting Principles ("GAAP"), as well as a material weakness in internal controls.  Had DHB appropriately reserved for product warranty claims and for excess and defective inventory in prior quarters, such a large charge would have been unnecessary.  In addition, had DHB properly reported its inventory and losses in accordance with GAAP, DHB's gross margins would have been much lower.

18.     In November 2005, the U.S. military also recalled more than 23,000 DHB Interceptor vests from use in the field.

19.     Then on March 17, 2006, the Company announced that it may have to restate its financial results for certain periods of 2005 due to "*inaccurate inventory records*" and potential errors in "*estimates of the cost of the Voluntary Replacement Program for Zylon(R)-containing armor products that the Company announced in the third quarter of 2005.*"

20.     Due to the Individual Defendants knowledge of the rapid degradation of Zylon®, both the charge and now the possible restatement could have been avoided.  The defendants were aware that Zylon® vests could not meet the five year warranty that the Company's vest's carried.  The Individual Defendants further knew that there was likelihood that Zylon® based vest would eventually be de-certified.  Nevertheless, the Individual Defendants caused DHB to continue to produce Zylon® based vests, offer a five year warranty on Zylon® based vests and conceal that Zylon® vests could not meet the five year warranty.

21.     The defendants caused or allowed DHB to disseminate improper statements that misstated and omitted key material information regarding DHB's true condition and business prospects.  Specifically, the Company's statements omitted material non-public information regarding problems concerning the effectiveness and durability of body armor manufactured by the Company with high concentrations of Zylon® and the repeated failure of DHB's Interceptor vest to meet government standards.  As a result of this irresponsible reporting of the Company's business prospects and product conditions, DHB's share price traded at artificially inflated levels, which the defendants sold at the Company's all-time price high contemporaneously with defendant Hatfield's Waiver.  The defendants caused or allowed the Company to omit the following material nonpublic facts from its press releases, SEC filings and other public statements:

(a)     DHB's Interceptor vests repeatedly failed to meet government contract standards and had critical, life threatening flaws;

(b)     DHB had never implemented the quality assurance plan that the government was paying an extra $50 per vest for;

(c)     Orders received from the U.S. military were not indicative of the military's confidence in or satisfaction with DHB's products because many of the vests sold and supplied to the military were defective and only accepted due to shortages in body armor;

(d)     DHB was unable to trace vests to lots of raw material which was a major quality control defect;

(e)     DHB had shipped thousands of vests containing high content of Zylon® that because of the defectiveness of Zylon based vests could not meet DHB's five year warranty on the same vests;

(f)     DHB had accumulated millions of dollars in Zylon® that defendants knew could not be continued to be used in manufacturing DHB's body armor;

(g)     DHB's financial statements were materially false and misleading because they failed to disclose customers' right to return its products because they did not meet the standards required by DHB's customers and DHB officers had signed waivers acknowledging the products did not meet the standards required by the government;

(h)     Continued sales of its body armor product lines could result in substantial costs based on the potential for liability claims;

(i)     Despite indications of the potentially unsafe and defective nature of its body armor, the Company falsely represented the quality and safety of its body armor products;

(j)     The Company was unprepared to determine the true financial impact of withdrawal of any of its products;

(k)     Shareholder value would be negatively impacted once the true facts about the Company's body armor products became known;

(l)     Optimistic statements regarding DHB's future prospects and profitability were false and misleading because the problems with DHB's various lines of body armor suffered major flaws; and

(m)     The defendants to this action had dumped massive quantities of the DHB holdings to maximize their profit before the above undisclosed information became public.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive action designed to confer

jurisdiction on a court of the United States that it would not otherwise have.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

23.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more defendants either resides in or maintains executive offices in this District, many of the acts and transactions complained of herein occurred in this District.

## THE PARTIES

24.    Plaintiff Alvin Viray is, and was at times relevant hereto, an owner and holder of DHB common stock.  Plaintiff is a citizen of California.

25.    Nominal defendant DHB is a corporation organized and existing under the laws of the state of Delaware with its headquarters located at 400 Post Avenue, Suite 103, Westbury, New York. DHB designs, manufactures and markets protective armor, through its subsidiaries, Point Blank and PACA.

26.    Defendant Brooks is, and at all times relevant hereto was, Chairman of the Board, Chief Executive Officer ("CEO") and a director.  Defendant Brooks dominated the rest of the Board. His domination and control is evidenced by the Board's approval of defendant Brooks' looting of DHB through massive self dealing and related party transactions detailed herein.  Because of defendant Brook's positions, he knew the adverse, non-public information about the business of DHB, as well as its do for all finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the relevant period, defendant Brooks participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  For FY:04 and FY:03, DHB paid defendant Brooks $762,500 and $781,250, respectively, in salary and other compensation, and granted

him 50,000 and 50,000, respectively, in options to purchase DHB stock and awarded him $2,000,000 and $1,000,000, respectively, in bonuses. During the relevant period, defendant Brooks sold 13,350,936 shares of DHB stock for proceeds of $212,569,684.32. As later accounted in an SEC investigation, defendant Brooks made $12 million between 1999-2001, while during the same period DHB lost over $16 million; all of this in addition to the millions in bonuses Brooks and others were receiving from DHB. Defendant Brooks sold over 56% of his shares in a four week span beginning on November 29, 2004. Also, in taking into account all of defendant Brooks' stock sales since 1998, over **70% of those sales were completed between November 29, 2004 and December 29, 2004**, just weeks before DHB stock began to slide from an all time high of over $20 a share to the present value of just under $3. In order the retain his control of DHB, however, defendant Brooks had the Board issue him millions of warrants to purchase DHB stock at $1 per share so that he could maintain his control of DHB even after dumping over $185 million in his stock in late 2004. Defendant Brooks is a citizen of New York.

27.     Defendant Hatfield is, and at all times relevant hereto was, COO of DHB. Because of defendant Hatfield's position, she knew the adverse, non-public information about the business of DHB, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to her in connection therewith. During the relevant period, defendant Hatfield participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:04 and FY:03, DHB paid defendant Hatfield $225,385 and $163,068, respectively, in salary and other compensation, and awarded her $750,000 and $695,000,

respectively, in bonuses. During the relevant period, defendant Hatfield sold 269,545 shares of DHB stock for proceeds of $5,292,041.35. Defendant Hatfield is a citizen of New York.

28.     Defendant Schlegel is, and at all times relevant hereto was, a Chief Financial Officer ("CFO") and a director of DHB. Defendant Schlegel is also listed as the point of contact by the U.S. government for TAP. Defendant Schlegel has also served as director, secretary and treasurer of Medi Data, a company that is 97% owned by defendant Terry Brooks. Because of defendant Schlegel's position, she knew the adverse, non-public information about the business of DHB, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the relevant period, defendant Schlegel participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:04 and FY:03, DHB paid defendant Schlegel $200,000 and $140,625, respectively, in salary and other compensation, and granted her 50,000 and 50,000, respectively, in options to purchase DHB stock and awarded her $500,000 and $100,000, respectively, in bonuses. During the relevant period, defendant Schlegel sold 149,503 shares of DHB stock for proceeds of $2,931,753.83. Defendant Schlegel sold over 65% of her shares *compared to never having sold any Company stock dating back to her addition as a director with DHB in 2000*. Also, in taking into account all of defendant Schlegel's stock sales, 100% of those sales were completed on November 29, 2004, just weeks before DHB stock began to slide from an all time high of over $20 a share to the present value of just under $3. Defendant Schlegel is a citizen of New York.

29.     Defendant Krantz is, and at all times relevant hereto was, a director of DHB. Because of defendant Krantz's position, he knew the adverse, non-public information about the business of

DHB, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, defendant Krantz participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the relevant period, defendant Krantz sold 116,226 shares of DHB stock for proceeds of $2,251,557.36. Defendant Krantz sold over 64% of his shares *compared to never having sold any Company stock dating back to his addition as a director with DHB in 2000*. Also, in taking into account all of defendant Krantz' stock sales, 100% of those sales were completed on November 29, 2004 and November 30, 2004, just weeks before DHB stock began to slide from an all time high of over $20 a share to the present value of just under $3. Defendant Krantz is a citizen of New York.

30.     Defendant Nadelman is, and at all times relevant hereto was, a director of DHB. Because of defendant Nadelman's position, he knew the adverse, non-public information about the business of DHB, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, defendant Nadelman participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the relevant period, defendant Nadelman sold 102,374 shares of DHB stock for proceeds of $2,007,554.14. Defendant Nadelman sold over 45% of his shares, *compared to never having sold any Company stock dating back to his addition as a director with DHB in 2001*. Also, in taking into account all of defendant Nadelman's

stock sales, 100% of those sales were completed on November 29, 2004, just weeks before DHB stock began to slide from an all time high of over $20 a share to the present value of just under $3. Defendant Nadelman is a citizen of New York.

31.    Defendant Chasin is, and at all times relevant hereto was, a director of DHB.  Because of defendant Chasin's position, he knew the adverse, non-public information about the business of DHB, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the relevant period, defendant Chasin participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the relevant period, defendant Chasin sold 108,496 shares of DHB stock for proceeds of $2,063,126.56.  Defendant Chasin sold over 68% of his shares, *compared to never having sold any Company stock dating back to his addition as a director with DHB in 2002*.  Also, in taking into account all of defendant Chasin's stock sales, 100% of those sales were completed on November 29, 2004 and November 30, 2004, just weeks before DHB stock began to slide from an all time high of over $20 a share to the present value of just under $3.  Defendant Chasin is a citizen of New York.

32.    Defendant Berkman is, and at all times relevant hereto was, a director of DHB. Because of defendant Berkman's position, he knew the adverse, non-public information about the business of DHB, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the relevant period, defendant Berkman

participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the relevant period, defendant Berkman sold 44,620 shares of DHB stock for proceeds of $864,748.20. Defendant Berkman sold over 19% of his shares, *compared to never having sold any Company stock dating back to his addition as a director with DHB in 2003*. Also, in taking into account all of defendant Berkman's stock sales, 100% of those sales were completed between November 29, 2004 and November 30, 2004, just weeks before DHB stock began to slide from an all time high of over $20 a share to the present value of just under $3. Defendant Berkman is a citizen of New York.

33.     Defendant Larry Ellis ("Ellis") is a director of DHB and has been since December 2004. Defendant Ellis was appointed President of DHB in May 2005. Because of defendant Ellis' position, he knew the adverse, non-public information about the business of DHB, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, defendant Ellis participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Ellis is a citizen of Connecticut.

34.     Defendant TAP is a corporation wholly own by defendant Terry Brooks. TAP sells armor plating to DHB that is produced out of DHB's Jacksboro, Tennessee facilities. Through its involvement in related party, self dealing transactions, defendant TAP aided and abetted the breaching of fiduciary duties by the Individual Defendants. TAP is headquartered in Tennessee.

35.     Defendants David Brooks International Inc., Andrew Brooks International Inc., and Elizabeth Brooks International Inc. are entities controlled by defendants Brook and Terry Brooks.

David Brooks International Inc., Andrew Brooks International Inc., and Elizabeth Brooks International Inc. are referred to herein as the "Brooks Entities." Through their involvement in the related party, self dealing transactions, the Brooks Entities defendants aided and abetted the breaching of fiduciary duties by the Individual Defendants. The Brooks Entities all have their headquarters at the residence of Terry and David Brooks in New York.

36.     Defendant Terry Brooks was at times relevant hereto the wife of defendant David Brooks. TAP is wholly owned and was founded by Terry Brooks. U.S. Manufacturing Corporation was also wholly owned by Terry Brooks before it was merged into TAP. Terry Brooks along with David Brooks also controls the Brooks Entities. Through her involvement in the related party transactions with the Brooks entities, defendant Terry Brooks aided and abetted the breaching of fiduciary duties by the Individual Defendants. Terry Brooks is a citizen of New York.

37.     Defendant Jeffrey Brooks is the brother of defendant David Brooks. Jeffrey Brooks is a director of TAP. Through his involvement in the related party, self dealing transactions, defendant Jeffrey Brooks aided and abetted the breaching of fiduciary duties by the Individual Defendants. Jeffrey Brooks is a citizen of New York.

38.     The defendants identified in ¶¶26, 28-33 referred to herein as the "Director Defendants." The defendants identified in ¶¶26-28, 33 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶26-32 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

39.     By reason of their positions as officers, directors and/or fiduciaries of DHB and because of their ability to control the business and corporate affairs of DHB, the Individual Defendants owed DHB and its shareholders fiduciary obligations of trust, loyalty, good faith and due

care, and were and are required to use their utmost ability to control and manage DHB in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of DHB and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

40.     Each director and officer of the Company owes to DHB and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

41.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of DHB, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with DHB, each of the Individual Defendants had access to adverse non public information about the financial condition, operations and improper representations of DHB.

42.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of DHB, and was at all times acting within the course and scope of such agency.

43.     To discharge their duties, the officers and directors of DHB were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the

financial affairs of the Company.  By virtue of such duties, the officers and directors of DHB were required to, among other things:

       (a)     Refrain from acting upon material inside corporate information to benefit themselves;

       (b)     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

       (c)     Conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

       (d)     Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's products and business prospects;

       (e)     Remain informed as to how DHB conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

       (f)     Ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

     44.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the

Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of DHB, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised all of DHB's Board.

45.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein infra, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws. As a result, DHB has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)    Costs incurred to carry out internal investigations, including legal fees paid to outside counsel;

(b)    Costs incurred in investigating and defending DHB and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment; and

(c)    Costs incurred due to the recall or discontinued sales of any Zylon® containing products, including replacement programs.

(d)    Costs associated with self-dealing related party transactions and the SEC investigation into those transactions.

46.     Moreover, these actions have irreparably damaged DHB's corporate image and goodwill.  For at least the foreseeable future, DHB will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that DHB's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

47.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

48.      During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its business prospects, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at DHB and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and  (iii) deceive the investing public, including shareholders of DHB, regarding the Individual Defendants' management of DHB's operations, the Company's financial health and stability, and future business prospects that had been misrepresented by defendants throughout the Relevant Period.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

49.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct and caused the Company to conceal the true fact that DHB was

misrepresenting its business prospects.   In addition, defendants also made other specific, false statements about DHB's financial performance and future business prospects, as alleged herein.

50.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of DHB common stock so they could: (i) dispose of over $227.98 million of their personally held stock; and (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

51.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial condition.   Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

52.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.   In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SELF DEALING AT DHB

53.     David Brooks, with approval from the rest of the Director Defendants, has used DHB as his personal piggy bank through myriad of self dealing transactions.  For example, defendant Brooks loaned DHB money at an above market interest rate to purchase Lanxide Armor Products ("LAP").  Shortly, thereafter LAP discontinued its operations and a shadow company owned by Terry Brooks, TAP, was started to produce the same products LAP had produced in the same DHB owned facility were LAPs equipment was located.  DHB then sold raw materials to TAP at cost and bought back the finished product at a profit to TAP and the Brooks' family.  As set forth in more detail below, defendant Brooks' made money on the procurement of LAPs equipment and continues to make money on the use of that same equipment all to the detriment of DHB.

54.     In February 1998, DHB purchased LAP under the pretext that DHB could produce hard armor plates for inclusion in DHB's bullet proof vest and body armor products.  The acquisition was financed by a personal loan from defendant Brooks to DHB.  Defendant Brooks profited enormously from this loan because he charged DHB 12% interest even though at that time the Federal Reserve Interest Rate for bank loans was at 8.5%.  The loan was secured by substantially all of the assets of DHB.  Thus, defendant Brook was in a position to either profit by an interest rate substantially higher than the market rate or obtain all of DHB's assets. These interest payments on these loans were not properly disclosed until the SEC forced disclosure in 2003.

55.     Upon completion of the acquisition, it was announced that DHB intended to continue to operate LAP.  LAP was called an "innovative company having unique technological capabilities in the development, design, testing and manufacture of armor research and development for the U.S. Department of Defense, and more than seven years of experience in the design, manufacture, testing and sale of products for specific armor systems and components."  In addition, DHB acquired LAP's

technology for "composite hard armor systems based on patented and highly proprietary ceramic/metal composite systems." The LAP acquisition was called "a tailor made fit for DHB," because "simply stated, there are no other companies so vertically integrated." and "plates are becoming more integral with the supply of concealable body armor." Despite this apparent need for LAP, in October 1999, less than two years after the company borrowed $7 million dollars at excessive interest rates from defendant Brooks to finance the $4.8 million purchase, it was disclosed that LAP discontinued its operations.

56. LAP's equipment was then shifted to DHB's Jacksboro, Tennessee facility. Shortly thereafter, in April 2000, Terry Brooks formed TAP to produce the same type of hard armor plates formerly produced by LAP. TAP operates entirely out of DHB's Jacksboro, Tennessee facility, the same place that LAP's equipment was moved to.

57. After TAP was formed, DHB began purchasing the same hard armor plating that is used to produce through LAP from Terry Brooks' TAP. DHB also began selling the raw materials for the armor plates at cost to TAP. For example, in 2004, DHB sold untreated ceramic cores to TAP at cost or $6.6 million. After Terry Brook's TAP manufactured the raw material into armor plating in DHB's facilities with the equipment and technology acquired from LAP, DHB purchased armor plates from TAP for $17.6 million. DHB also paid Terry Brooks' TAP $29,243,000 in 2003 and more than $54 million total between 2002-2004. In fact, annual payments by DHB to TAP have constituted as much as 13% of DHB's total revenue. TAP has never sold products to anyone other than DHB. TAP's existence and the related party transactions were not disclosed by Defendants until forced to do so by the SEC in 2003.

58.     Further evidencing that TAP is nothing more than a shadow entity created to divert DHB money and opportunity to defendant Brooks' family is the fact that DHB and TAP share numerous addresses:

- 179 Mine Land, Jacksboro, TN is the location at which both PACA (a DHB subsidiary) and TAP conduct operations.  TAP has no other manufacturing operations.

- 400 Post Ave., Suite 303, Westbury, NY is the mailing address for TAP and DHB.

- 555 Westbury Ave., Carle Place, NY is the former mailing address for TAP and DHB

- P.O. Box 269, Old Westbury, NY 11568 is the federal government's Central Contractor Registry address for TAP; DHB frequently uses the address as its contact address in advertisements.

59.     In addition, Jeffrey Brooks is a director of TAP and defendant Schlegel is the point of contact for TAP in the governments Central Contractor Registry.  It has still not been disclosed publicly that DHB employees are on the TAP payroll.

60.     TAP is not the only entity owned by his wife that defendant Brooks has used to funnel money from DHB into his own pockets.  In 2002 and 2003, DHB paid U.S. Manufacturing Corporation, another Terry Brooks' company, over $600,000 for "stitching work."  These related and self dealing stitching work transactions were first revealed in DHB's March 17, 2005 10-K for the FY:04.  Recently, U.S. Manufacturing Corporation has been merged into TAP.

61.     Yet another example of defendant Brooks' related party transactions designed to enrich himself and his family is the lease of the facilities for DHB's Point Blank subsidiary.  From 1995 until June 30, 2004, Point Blank leased its office and manufacturing space in Oakland Park, Florida from V.A.E. Enterprises LLC ("VAE").  Terry Brooks controls VAE and it is beneficially owned by the Brooks' children.  DHB paid total base rent under the lease to Brooks' children in excess of $1.2 million in 2002 and 2003.

62.     In addition to funneling money from DHB by using his wife's companies to perform work that DHB is capable of performing, defendant Brooks also uses DHB to pay for many aspects of his lavish lifestyle.   Defendants Chasin, Nadelman and Krantz, as members of Compensation Committee, have approved all of the following payments of DHB's funds to defendant Brooks.   First, defendant Brooks gets up to $25,000 per month for the cost of renting his 4,947 sq. ft. beachfront condominium at the Presidential Palace Condominiums located within the Boca Raton Resort and Club.   While it was disclosed that payments for the residence were made to defendant Brooks "affiliate," it was not disclosed that the Florida residence is owned by Vianel Industries, Inc., a company controlled by Jeffery Brooks.   Jeffrey Brooks lives in another unit in the exclusive oceanfront complex.   David Brooks himself is also involved in the affiliate as evidenced by the fact that the president of the Presidential Palace Condominium Association gave its approval in October 2005 for "**David Brooks**, **Vianel Industries**, **Inc**." **to acquire title to the unit**.

63.     Defendant Brooks also utilizes a corporate jet owned by one of the Brooks' minor children for business and personal travel.   DHB purportedly pays rates equivalent to comparable charter flights, as determined by the Compensation Committee, to an entity controlled by the Brooks when David Brooks uses the plane for DHB business.   In 2004, DHB paid $696,000 to "non-affiliated third-party vendors for pilot pay, fuel, and plane maintenance" purportedly associated with DHB business travel, and paid $161,000 to the Brooks as compensation for mere use of the plane.   In total, defendant Brooks, through his minor children, received more than $850,000 in 2004 alone from DHB to pay for what is essentially his own plane.   Defendant Brooks, for example, used the plane to fly superstar musicians to his daughter's $10 million bat mitzvah.   According to the Federal Aviation Administration, the registered owner of the plane is RSJ Industries LLC.   RSJ Industries, Inc. is a Florida company controlled by David and Terry Brooks, who are its Directors.   RSJ Industries, Inc. is

registered to the beachfront condominium purportedly rented by DHB for defendant Brooks as a business expense related to his travel to Florida and title to which was recently transferred to Brooks.

64.     Defendant Brooks also uses his company credit card to pay for many non-business expenses.  For example, in 2003, defendant Brooks charged $322,000 of personal expenses to DHB credit cards.  Defendant Brooks never repaid the money.  Instead, the Compensation Committee determined that it failed to adequately reimburse Brooks for corporate use of a residence and business use of his minor children's plane, expenses which totaled $721,000.  Despite defendant Brooks having seemingly been short-changed nearly $400,000 by DHB, Brooks waived his rights to collect.  Then in 2004, defendant Brooks charged another *$2 million in personal expenses* to DHB credit cards.  This charge was supposedly offset by $2.7 million owed by DHB to defendant Brooks for unpaid expenses incurred by Brooks from 1997-2003.  Again, defendant Brooks forewent collection of the additional $700,000.

65.     In total, David and Terry Brooks and Jeffrey Brooks own or control at least thirty-seven separate entities registered with in different states.  Some of these entities are known to conduct business with DHB, although the full extent of the benefits the Brooks' receive from self dealing is unknown at this time.  For 2004 alone, defendant Brooks and his family received a staggering $98 million in compensation and payments from related party transactions.  Defendant Brooks' himself received $73.3 million on total compensation during 2004 when his options exercised as part of his $186 million stock sale are taken into account.  DHB also paid approximately $23 million to the Brooks family and forgave another $2 million in personal credit card debt, in 2004.  Thus, during in a year when DHB set a "record" for total net income of $30.44 million, defendant Brooks and his family members received over three times that much.

66.     On September 8, 2005, *TheMotleyFool.com* published an article entitled "4 From the Dumpster."  The article stated in part:

DHB: Protection for everyone but shareholders

Everyone likes the body armor biz, right? Contracts with our military, a product anyone could love, and now trading at a substantial discount to last year's price. What could possibly be wrong? In a word, everything.

The formerly high-flying body armor maker (and, alas, Motley Fool Stocks 2004 pick) is reeling from recent controversy over vests using Zylon® fiber, which reportedly loses a lot of its projectile-stopping potency as it ages and breaks down. In April, DHB's accounting firm decided not to come back, after having served a mere year and a half in the position following the 2003 resignation of Grant Thornton. I firmly believe that these problems wouldn't keep DHB down forever. But there are more worrisome things to consider.

DHB's main problem is up in the executive suite. ***Namesake CEO David Brooks and other bigwigs cashed out tens of millions of dollars' worth of stock options last year when the company traded in the high teens and low 20s***. If you want a barometer of how substantial this was, consider that ***Brooks' personal take from options exercises alone in the last fiscal year was $70 million***. ***The company achieved net income of $76.7 million total over the previous five years -- and lost $32 million the year before that***.

Now that this company has cratered to one-fourth its former high price, I don't see any insider buying. ***Instead, I see insiders granting themselves a giant pile of warrants, including a ludicrous 1.5 million to Brooks at a $1 strike price, vesting immediately -- with another 750,000 vesting each year until 2010***. Unless the board changes its mind and vests them earlier. Mix in overly generous housing and personal benefits and ***a slew of creepy related-party transactions that enrich family members***, and you can only come to the conclusion that Brooks believes that what's his is his, and what's yours is his too.

My advice: ***Leave this one to marinate in garbage juice***, because that's exactly where Brooks will leave you if he gets the chance.

67.     Defendant Brooks used some of the money he pilfered from DHB to throw a ***$10 million party for his daughter***.  On December 6, 2005, the *MotleyFool.com* published an article entitled "DHB: Shades of Tyco?"  The article reported on the party and compared defendant Brooks to the now jailed Dennis Kozlowski.  The article stated:

Historians tell us that "history repeats itself." What they don't tell us is how quickly it repeats, or how precisely.

Remember Dennis Kozlowski? He of "whizzing Cristal" fame? The ex-CEO was sentenced to eight to 25 years in prison for his part in pillaging the Tyco industrial conglomerate for $600 million worth of salaries, bonuses and perks earlier this year

(in conjunction with ex-CFO Mark Swartz). But what made the man truly infamous was not the looting, but his profligate spending of the loot on a $2.1 million birthday party for his wife on the island of Sardinia.

In a column I penned on the subject last June, I opined that Kozlowski would be "a hard act to follow." As it turns out, it hasn't been that hard at all.

**Kozlowski lives**

*Last week, we learned that another infamous CEO, body-armor manufacturer DHB Industries' David H. Brooks, made headlines for actions that seem borrowed nearly line-for-line from the Dennis Kozlowski playbook.*

For well over a year now, we've tracked the fortunes of Mr. Brooks' company. DHB was a Watch List stock of our *Motley Fool Hidden Gems* newsletter, and an (ill-advised) recommendation of our crystal ball-gazing *Stocks 2004*.

*What's gotten our attention, mostly, has been Brooks' pattern of apparent self-enrichment at the expense of his firm's outside investors. For example, at the tail end of 2004, as DHB's stock was flying high on news of strong body armor sales to the U.S. military in Iraq, Brooks reported to the SEC that he had sold off $186 million worth of stock. DHB's board of directors subsequently issued him warrants to buy 5 million more shares at $1 per stub.*

Investors naturally wondered why DHB's CEO was selling off so many shares. Was the company poised for a fall, or did Brooks just need to raise some cash? As it turns out, the answer could be "yes" to both questions. First, the company started changing audit firms faster than some people change their socks. DHB lost its fifth auditor, Grant Thornton, when that firm resigned in 2003. Its replacement auditor followed suit in April of this year. Soon after, the firm's stock price collapsed on the news that a synthetic fiber used in DHB's "bulletproof" vests was defective, and that the firm would need to take up to a $60 million charge to replace vests already sold.

In addition, it seems Brooks did need the cash. His daughter's bat mitzvah party was looming.

**50 cents, and a little more**

Here's where the story gets good. (Or sordid. Or both, depending on your perspective.) Last weekend, Brooks threw a monster coming-of-age party for his daughter (name suppressed to protect the innocent) at New York's Rainbow Room, the self-described pinnacle of "New York style, glamour and sophistication."

*The guest list reportedly included 150 of Brooks' closest friends and business associates, and another 150 friends of the young debutante. Nothing too over-the-top there. Yet Brooks somehow managed to spend a total of $10 million on the fiesta, which works out to an average of $33,000 per head. At that rate, this party easily topped the per capita cost of Kozlowski's wife's birthday bash. ($2.1 million divided by 75 guests equals $28,000 per head. Imagine the chewing-out Kozlowski will receive from the missus when he returns from the Big House. "That little Brooks girl got $33,000 per, and all I got was a measly...")*

As for how Brooks spent all this loot, part went to purchase gift bags for the guests, stuffed with digital cameras and the trendy gift du jour: Apple iPods. But the bulk of

- 30 -

the cost went to hire the entertainment, which ranged from the formerly famous (Don Henley, Stevie Nicks, and Kenny G), to the newly famous (50 Cent and Ciara), to the still pretty well known (Aerosmith and Tom Petty).

**Is the party over?**

As with Kozlowski, it's not the apparent stock profiteering that gets the press in the Brooks debacle. True, Brooks is being investigated by the SEC, but that doesn't make for nearly as compelling a headline as something like "***War Profiteer Throws $10 Million Bat Mitzvah***."

As a result, although throwing a bodacious party is not an indictable offense, DHB investors can still hope that its publicity will pressure the SEC to develop an actual prosecution out of its investigation. Even failing that, the bad press garnered from Brooks' profligate spending of his capital gains could finally convince DHB's board to develop a spine and boot Brooks from the CEO chair.

Either result, one suspects, would give DHB's stock a boost, and provide some recompense to investors who -- like us -- mistakenly lent their trust to this CEO.

**Morality tale**

Which brings us to the moral of this story: Management matters. We ***recommended DHB in Stocks 2004 back in December of 2003***, ***before the full extent of Brooks' cupidity was apparent***. At the time, with the Middle East conflict set to continue for years, DHB seemed perfectly positioned to "do well by doing good" -- producing armor for our troops and profits for its shareholders.

But as we've seen since, a bad manager can transform even a great business into a lousy investment. To date, DHB has been the absolute worst performer among all stocks on our Watch List -- down 76% over the past year. At the same time, we've seen how ethical managers can turn seemingly mediocre businesses into stellar performers.

68.    Defendant Brooks' extensive often undisclosed self-dealing and related party transactions are currently under investigation by the SEC.  As a result of these transactions, defendant Brooks and his family have been enriched to the detriment of DHB and corporate opportunity has been usurped from DHB.

**INDIVIDUAL DEFENDANTS' KNOWLEDGE OF PROBLEMS WITH ZYLON®**

69.    One of the bullet resistant materials used in the production of DHB vest products was a fiber known as synthetic PBO (poly p-phenylene-2, 6-benzobisoxazole) fiber, commonly referred to as "Zylon®," which it used to manufacture bulletproof vests.  Zylon® first debuted in the body armor industry in the late 90s as a lighter and more wearable alternative to armed fabrics, such as Kevlar®.

Toyobo is the sole manufacturer and supplier of Zylon® which it sold to DHB and other companies for use in production of bullet resistant material. Beginning in or about 1998, Toyobo marketed Zylon® as a high performance fiber combining great strength with light weight, suitable for use in protective cloth, heat resistant materials and body armor.

70.     Toyobo communicated to Zylon® purchasing customers that test results showed that the strength of Zylon® decreased under conditions of elevated temperatures and humidity. In a letter dated July 2001, Toyobo informed body armor manufacturers that "the strength of Zylon® fiber decreases under high temperature and humidity conditions." Toyobo also reviewed and discussed these facts in meetings conducted with various body armor manufacturers. Toyobo expressly advised manufacturers to reconfirm that their particular product designs met their customers' requirements and to "determine carefully the lifetime of the product based on the design." In another letter to Zylon® customers, Toyobo informed them of tests showing Zylon®'s inadequacies and revealed Zylon® fibers showed larger than anticipated loss of strength at 40 degrees Celsius and 80% humidity. At that time, Toyobo also advised manufacturers, such as DHB, to "share the information with customers, if it is needed."

71.     During 2001 through 2003, Toyobo continually tested Zylon® fibers and provided these results to customers which showed deficiencies following exposure to certain temperatures and changes in humidity. On August 28, 2001, Toyobo updated customers that testing done on Zylon® "found out a little bigger strength drop than we expected in the last statement" when Zylon® was exposed to heat and humidity. In November of 2001, Toyobo once again wrote that things were even worse and stated "we observed that the strength drop did not follow the straight line." Tests had shown that Zylon® degraded at increased speed over time. In light of the degradation issue, and because of its ongoing desire to understand the strength of Zylon® and to share that information with

the body armor industry, Toyobo has continued to prepare and furnish the results of its Zylon® testing to the industry and customers on a quarterly, then semi-annual, basis since January 1, 2002.

72.     On December 23, 2002 a competitor of DHB named U.S. Armor declared "it would be irresponsible for us to produce any Zylon® based armor products at this time," and did so based on industry knowledge of the degradation of Zylon®.  Based on tests, reports and lawsuits concerning Zylon® containing products, another DHB competitor named Second Chance recommended the immediate replacement of faulty bullet resistant vests as of June 2005.  Like their competitors, DHB has sold Zylon® vests to law enforcement and military entities at times when the defendants knew or should have known that the vests containing Zylon® degraded when exposed to sunlight, fluorescent lamps, elevated temperatures and humidity.

73.     In 2002, testing conducted by the New York City Police Department and an independent laboratory in Maryland showed that not all DHB vests were stopping certain bullets.  "Some tests were done with the same weapons, and when we fired different bullets, some .45s and 9 mms were stopped, while others were not," Chief Michael Collins told *The New York Post* in an October 2002 article.

74.     Toyobo again made disclosures to Zylon® vest manufacturers in October 2003 concerning Toyobo's accelerated aging studies on Zylon® fabric.  The studies had been performed on Zylon® manufactured in May 2000 and tested from June 2001 to July 2003 at the Toyobo Research Center. The Toyobo research showed a 25% degradation of Zylon® stored at 104 degrees Fahrenheit and 80% relative humidity.  Then, in two separate instances in June 2003, law enforcement officers were either killed or severely disabled while wearing vests made of Zylon®.  Officer Zeppetella of Oceanside, CA was killed when two bullets passed through his vest and Officer Ed Limbacher of

Forest Hills, PA became disabled as a result of a shot in the stomach while wearing a Zylon® vest made less than one year before.[3]

75.     News of these safety concerns came at a bad time for the Company because it was embroiled in a bitter labor dispute with the Union of Needletrades, Industrial and Textile Employees ("UNITE".)  The UNITE dispute, and the serious disruptions it was causing on the Company's production schedule had already subjected the Company to a torrent of bad press. Now, safety concerns were plaguing its key product.

76.     The Individual Defendants' immediately went on the offensive, claiming that the safety allegations were untrue and that they were nothing more than a politically-motivated smear by UNITE. Thus, on September 12, 2002, the Individual Defendants caused the Company to issue a press release that stated, in part, "At Point Blank, we never forget that our customers rely on us to protect their lives. ***Our corporate philosophy is that there is no substitute for product integrity and customer service***."  (Emphasis supplied).

77.     On November 17, 2003, further information regarding Zylon® was made available when Attorney General John Ashcroft announced that the NIJ has issued two status reports to the Attorney General containing results from the body armor studies which highlighted the following findings:

- ***Ballistic-resistant material***, ***including Zylon®***, ***can degrade due to environmental factors***, ***thus reducing the ballistic resistance safety margin that manufacturers build into their armor designs***.

- The ultimate tensile strength of single yarns removed from the rear panel of the Forest Hills armor was up to 30-percent lower than that of yarns from "new" armor supplied by the manufacturer. Artificially-aged armor of the

_____

[3]   Officers Limbacher and Zeppetella's vests were manufactured by Second Chance, a DHB competitor.

same type that failed in the Forest Hills incident was ballistically tested, but no bullet penetrations occurred.

- The upgrade kits tested did not appear to bring used armor up to the level of performance of new armor. However, used armors with upgrade kits performed better than the used armors alone.

The NIH also indicated that:

- Although these results do not conclusively prove that all Zylon®-containing body armor models have performance problems, *the results clearly show that used Zylon®-containing body armor may not provide the intended level of ballistic resistance*. In addition, the results imply that a visual inspection of body armor and its ballistic panels does not indicate whether a particular piece of Zylon® containing body armor has maintained its ballistic performance.

- Part of the Body Armor Safety Initiative entailed an applied research component that examined material properties of Zylon® in order to understand the causes of the ballistic failures. *Zylon® fibers show a systematic loss in tensile strength, tensile strain, and ballistic performance correlated with the breakage of specific bonds in the chemical structure of the material*.

78.     Certain DHB competitors took heed of the industry knowledge of Zylon®'s deficiencies. For example, on April 16, 2004, Second Chance Body Armor announced that it will no longer manufacture the Tri-Flex body armor because of concerns regarding "Zylon® fiber performance durability."

79.     Then, in June 2005, Second Chance Body Armor recalled nearly 100,000 bullet-resistant vests because Zylon® degrades too quickly. Several years earlier, Second Chance had recalled 130,000 body armor vests made entirely of Zylon®. The June 2005 recall was for vests made of a combination of Zylon® and other materials.

**DEFENDANTS' KNOWLEDGE OF DEFICIENCIES IN DHB'S INTERCEPTOR VESTS**

80.     Because the overwhelming majority of the Company's sales were to the U.S. Military, Congress also began an inquiry into the safety of the Company's vests based on the dispute with UNITE. As reported by the *Associated Press* on September 19, 2002;

U.S. Rep. Neil Abercrombie is among lawmakers who say U.S. soldiers in Afghanistan could be at risk because of a labor dispute at the factory that produces bulletproof vests for troops.

Company officials and the Pentagon, however, say there are no problems with the quality of the vests produced by Point Blank Body Armor of Oakland Park in South Florida. And the New York City Police Department, which asked for further tests of similar vests after they failed to stop some bullets, has settled its dispute with the company.

The dispute played out Thursday on Capitol Hill. Leaders of the Union of Needletrades, Industrial and Textile Employees, which is trying to organize workers at the plant, have been backed by several lawmakers, including Abercrombie and Rep. Alcee Hastings, D-Fla. Workers have been on strike since Aug. 9 trying to organize a union.

"This is a crisis for the soldiers and police officers who have to wear these products," UNITE President Bruce Raynor said.

But Pentagon spokesman Jack Hooper said there have been no complaints about the vests' quality, and Paul Donofrio, an executive vice president of Point Blank's parent company, DHB Industries of Carle Place, N.Y., said a Defense Department employee is at the plant watching over the manufacturing. He said the company hired experienced workers to replace the strikers.

"These were qualified, experienced people that we put in," Donofrio said. "We're very confident as to the production quality and integrity of our products."

Even before the workers went on strike, the New York City Police Department ordered new tests of its bulletproof vests after some of the body armor failed to stop certain bullets, spokesman Sgt. Kevin Hayes said. But the police settled their dispute Thursday, Hayes and Donofrio said. Point Blank will replace 1,000 vests with a different model, Donofrio said.

Still, Sam Cabral, president of the International Union of Police Associations, said the union was advising its 100,000 members to avoid buying the vests. "There's just no room for mistakes in our profession," Cabral said.

Abercrombie, D-Hawaii, a member of the House Armed Services Committee, said the quality of the vests - and therefore the safety of U.S. troops - will be hurt by having untrained replacements rather than veteran union) workers on the job.

"***We are going to follow through to see to it that this quality is maintained***," Abercrombie said. "The only way that can be done is by having quality people produce the body armor. That can't be done with casual hires at minimum wage or less." (Emphasis supplied).

81.    On September 26, 2002, the *Miami Herald* also reported on safety inquiries with

respect to the Company's vests. In part, the article state as follows:

The Defense Department is looking into allegations by striking workers that Oakland Park-based Point Blank Body Armor supplied defective bulletproof vests to the military.

The department's inspector general launched a review of the charges made by 14 Point Blank employees following a Sept. 19 letter it received from the chairman of the U.S. Senate Armed Services Committee.

Sen. Carl Levin, D-Mich., the committee's chairman, had received certified statements from the striking workers, who alleged Point Blank used old ballistic material in vests, passed off lesser-grade protective gear as higher quality, and sewed wrong sizing labels into vests.

"I would like to emphasize that the facts alleged in these affidavits, if true, would constitute a serious criminal violation that could endanger the lives of our men and women in the military," Levin wrote in his letter to Dan Stanley, deputy assistant secretary of defense.

\* \* \*

Point Blank officials maintain there are no quality concerns related to the vests.

Workers "don't like the fact that the company is putting out poor quality products even though they bring it to the attention off managers," said Scott Cooper, a Unite director.

82.    The Individual Defendants immediately fired back at UNITE. As reported in the June

18, 2003 edition of Newsday:

A week after UNITE wrote the Securities and Exchange Commission alleging DHB may be violating securities laws, the company said the union had made "hypertechnical arguments and exaggerated claims intended to d mage this company's reputation by any means necessary."

UNITE last week charged that Terry Brooks, the wife of DHB founder and Chairman David H. Brooks, owns a separate entity called "hactical Armor Products that does business with the company. UNITE said DHB has not disclosed the transactions.

DHB strongly denied the charge, saying "We take our disclosure obligations very seriously, and have disclosed 'related party' transactions in the past, and will include any required information in our next proxy statement to be released imminently."

The company also said it has "already disclosed is business relationship with Tactical Armor Products in other government filings, and DHB has benefited from its business relationship with TAP, which supplies body armor plates to DHB."

Brooks, in a telephone interview, said, "TAP has been on our Web site. We've done business with them. They're a subcontractor of DHB's."

Luke Brindle, a UNITE spokesman in Manhattan, said it was "troubling" that DHB admitted to a business relationship with TAP, because of the potential conflict-of-interest it poses.

83.     In 2004, DHB procured large military contracts to supply body armor equipment.  In and throughout 2004, these vests failed to meet military contract ballistic test specifications and various experts working for the military advised the government not to accept DHB's vests under the stated contract terms.  Out of urgency for supply in foreign wars, the military accepted lots of DHB's body armor despite executing waivers detailing the non-compliance with testing requirements.  On November 30, 2004, defendant Hatfield also signed a Waiver constructively acknowledging durability and degradation problems associated with DHB's Zylon® vests.  ***Contemporaneously with Hatfield's Waiver*, *Hatfield and the other Insider Selling Defendants*, *including everyone on the Board at that time*, *sold millions of dollars of DHB stock*.**

84.     On May 9, 2004, the Marine Times published an article entitled "The Marines' flawed body armor."  The article was picked up by Newsday on May 10, 2005.  The article detailed the major flaws in DHB's interceptor vests.

> ***Corps recalls more than 5,000 vests that experts rejected — but some remain in the field***.
>
> The Marine Corps issued to nearly 10,000 troops body armor that ***government experts urged the Corps to reject after tests revealed critical***, ***life-threatening flaws in the vests***.
>
> In all, the Marine Corps accepted about ***19,000 Interceptor outer tactical vests from Point Blank Body Armor Inc***. ***that failed government tests due to "multiple complete penetrations" of 9mm pistol rounds***, ***failing scores on other ballistic or quality-assurance tests***, ***or a combination of the two***.
>
> "Since these are lifesaving pieces of equipment and are being used in support of the Iraq war, I urge immediate action since ***this technical office has little confidence in the performance of the items to provide the contracted levels of protection as defined in the performance specification***," ***wrote ballistics expert James MacKiewicz in a memorandum rejecting two lots of vests on July 19***, ***2004***.
>
> MacKiewicz is responsible for verifying that each production lot of Marine vests meets protective requirements and other quality standards. He works at the Army Soldier Systems Center in Natick, Mass., and has 18 years of experience with ballistics and armor systems.
>
> A second government agency, the Defense Contract Management Agency, backed Natick's conclusion and also recommended against the waivers.

*"**Anything less than full compliance for a safety item such as the [Interceptor body armor] is unacceptable**," DCMA wrote in a 2004 memorandum recommending that the Corps reject the vests.*

But according to documents obtained through the Freedom of Information Act and interviews with officials at Natick, the Marine Corps and Point Blank, the service rejected that advice. *Instead, the Marine program manager responsible for fielding the vests, Lt. Col. Gabriel Patricio, and Point Blank's chief operating officer, Sandra Hatfield signed waivers that allowed the Corps to buy and distribute vests that failed to meet the Corps' minimum standards and specifications.*

Faced with the imminent publication of this story, the result of an eight-month investigation by Marine Corps Times, t*he Marine Corps on May 4 issued a Corpswide message recalling 5,277 Interceptor vests*;

## Deployment demands

The judgment call fell to Patricio, who *over 10 months last year would waive and accept at least 20 lots of outer tactical vests that didn't pass muster with government testers*.

Systems Command did not inform field commanders about the waivers when the equipment was distributed, Reinwald said.

Patricio said he briefed Catto in February 2004 when the first waivers were issued, as well as in subsequent meetings on procurement of various types of armor to protect Marines and their equipment from the growing threat of insurgent attacks in Iraq.

In his written statement, Catto said he agreed with the decision to issue the waivers.

"I concurred with the program manager's decision to waive the 11 lots in order to rapidly replace the PASGT flaks with a superior, advanced body-armor system," Catto said in the statement. "Due to the massive deployment associated with [Operation Iraqi Freedom], this was considered to be an urgent need, and was deemed to be in the best interest of deployed Marines at that time."

Both Reinwald and Patricio said the notion of redistributing Interceptor vests already fielded among deploying forces was considered, but deemed too difficult to execute in time for the deployments.

*"**This was one of these situations where they're screaming for these OTVs [and] these guys have to get them**," Reinwald said. "At that time, we had the operational requirement that we didn't have the schedule to play with*."

The waivers came at a time when U.S. forces were facing increased risk from roadside bombs, ambushes and intense urban combat. The military rushed to field the Interceptor armor to all its troops, not just those typically involved in close combat, pushing the vests to the field as quickly as they were produced.

Systems Command officials responsible for developing and issuing the Interceptor vests argue that since the vest is worn in concert with the armor insert plates, the combined system offers more protection than the older personnel armor system for ground troops, or PASGT, that it replaced.

The Interceptor outer vest protects the wearer against 9mm rounds and shrapnel; a pair of armor insert plates offer additional protection against small-arms fire up to 7.62mm. Interceptor affords 10 percent greater protection against shrapnel threats than the PASGT vests, according to Army officials.

All vests stand some chance of failing, but the vests issued to Marines from waivered lots have a greater chance of being penetrated than vests that met Natick's test criteria, experts there said.

"You have an increased risk of ballistic incident — statistically" with these vests, said Bob Kinney, director of the individual protection office at Natick. Kinney has worked on individual protection equipment such as chemical and biological defense suits and body armor at Natick for more than two decades.

The Marine Corps has been buying its Interceptor body armor vests through the Army's Soldier Systems Center since 1999. Natick manages the contract and tests random samples of each production lot at Aberdeen Test Center, Md., to ensure the vests meet specifications. Aberdeen is the Army's chartered agency for ballistic quality assurance verification. The Army does not conduct its testing at Aberdeen, however, instead using commercial labs because of their independence from the service and the speed with which they deliver test results.

The Marine Corps' assertion that the 19,000 vests meet ballistic specifications is based in part on results from additional tests conducted at a private test lab, H.P. White of Street, Md.

Systems Command subjected some of the rejected lots — a batch comprising about 8,000 vests — to additional testing at H.P. White and obtained results that command officials said were satisfactory.

But the ballistics experts at Natick recommended against fielding any vests until they could identify and resolve the larger issue behind the vests' declining quality.

"***Based on ballistic test data and previously identified quality assurance failures***, **I do not recommend acceptance of these lots and do not recommend acceptance of future lots until this issue is resolved**," MacKiewicz wrote in an August 24, 2004, memo failing two lots.

***The memo is one of many that MacKiewicz drafted from as early as January 2003, warning of poor ballistic test results and recommending the Marine Corps solve the problem before shipping any more vests to its troops.***

\* \* \*

***The first vest failures had come to light in mid-January 2003, as officials with Point Blank notified Marine contract officers of problems at their Oakland Park, Fla., test facility.*** Hatfield told Marine Corps Times the failures stemmed from improper testing equipment at their ballistic lab.

Over the next year, Natick officials assumed responsibility for testing vests from Point Blank as they investigated why the original failures occurred.

***In December 2003, contract officers and testers discovered that multiple vests from two other lots failed ballistic tests, this time at the Aberdeen facility.***

*Vests from lots 69-9 and 69-12 suffered multiple penetrations of 9mm bullets at speeds below 1,525 feet per second.*

\* \* \*

*Those penetrations were of particular concern because previous tests yielded passing results at an average velocity of 1,620 feet per second, well above the contract benchmark, according to a document written by Mike Codega, a technical representative at Natick who worked with MacKiewicz on the Marine vest program. Also a point of concern was the complete penetration of a vest from lot 69-12. This one was below 1,450 feet per second, a speed at which no vest penetration should occur.*

\* \* \*

*In further tests of lots 69-9 and 69-12, as well as four additional lots, MacKiewicz and his colleagues noticed a continued decline in the Point Blank armor's ballistic strength. Some of the vests were also showing deep indentations — though not penetrations — at speeds that, taken together with the full penetrations in earlier lots and the fact that the indentations were deeper than they should have been, prompted testers to raise a red flag.*

\* \* \*

*"We see no reason to be concerned that the quality has deteriorated or that the performance has deteriorated in any fashion," said Hatfield, Point Blank's chief operating officer, in an April 20 interview at her Pompano Beach production facility in Florida.*

\* \* \*

*Problems with the Point Blank vest design used by the Marine Corps keep cropping up. For example, as part of the competition for an Army vest contract late last year, that same model of Point Blank's Interceptor vest failed ballistic tests that simulate shrapnel hits, according to Karl Masters, the lead engineer for the Army's Interceptor body armor program. That test — a lower standard than for 9mm rounds — was conducted by H.P. White.*

\* \* \*

When asked in an interview whether he suspected any material or manufacturing flaw in the vests might be to blame for the rejections by government testers, Patricio said only that "*we had the manufacturers involved in the process to the extent that the parties communicated with each other and attempted to work through the process*" of addressing the failures.

\* \* \*

*He therefore would issue a "temporary waiver providing Marines with OTVs of questionable performance," promising that "if, at a later date, the performance is shown to conclusively not meet the government's performance specification, then the issue will be addressed at that time."*

*The waiver turned out to be anything but temporary. Over the next year, Patricio went on to issue waivers for at least 20 lots representing nearly 19,000 vests.*

*"The OTVs in the stated lots do not fully comply with the current Marine Corps performance specification for the OTV and do not meet existing contractual requirements," Patricio wrote in one waiver, accepting a shipment of nine lots — about 4,500 vests — that testers at Aberdeen rejected.*

\* \* \*

**Material tracking problems**

*Natick officials said they pleaded with Point Blank to properly document and track the materials and manufacture of the vests so they might pinpoint the problem. But they said Point Blank could not deliver the information they needed.*

*The Marine Corps contract included a premium of about $50 extra per vest to cover additional quality assurance procedures at Point Blank, MacKiewicz said.*

Among other information that was of interest to Natick testers was which rolls of woven Kevlar fiber were used, for example, in the assembly of the layered ballistic vest panels.

*"That process was basically broken," MacKiewicz said. "I could not distinguish between one roll of material that went into the first 500 or the second 500 or the third 500."*

*In a series of memos written over the summer of 2004, in which MacKiewicz explained his reasoning for rejecting certain lots delivered by Point Blank, the testing expert detailed his concerns.*

*In recommending the rejection of lot 71-12 on July 19, MacKiewicz warned of "major quality assurance deficiencies" at the company. He recommended "disciplinary action against the contractor to resolve the issue."*

*In a July 21 memorandum to Patricio recommending the rejection of two more lots, 69-84 and 71-9, MacKiewicz wrote: "One of the significant factors, which ultimately led to award a contract to Point Blank, was their proposed quality assurance procedures for eliminating defects and tracking materials. ... Point Blank is not compliant with their manufacturing quality control proposal and their contractual obligation for providing consistent product performance and reliability."*

\* \* \*

**No purchases after '04**

*The Marine Corps fielded vests from the failed lots through the end of 2004, documents and interviews show, but stopped taking delivery of Point Blank manufactured vests in early 2005. By then, the contract had not been exhausted — at least 9,000 vests could still have been purchased.*

\* \* \*

> Nonetheless, Point Blank's stock has dropped precipitously this year. In early January, the stock was riding at $17.86 before dropping about 61 percent over the first four months of the year.
>
> On May 3, the day before the Corps announced its body armor recall, Point Blank parent company DHB Industries announced it had named a new president.

85.     As the Marine Times article made clear, officials at DHB were fully aware of test failures as early as January 2003 and that DHB officials were involved in the testing process.   The article also made clear that as of November 24, 2004 (right before the massive insider sell-off) completed vests were being held at DHB facilities for ballistic testing failures during quality assurance testing.  The article also made clear that DHB officials signed waivers throughout 2004 to allow the Marines to purchase the defective vests.  One of these waivers was signed by defendant Hatfield on November 30, 2004 (the second day of the massive insider sell-off).

86.     The Marine Times article further exposed that DHB officials were not complying with their contractual agreement to follow certain quality assurance procedures.  These procedures were designed to limit defects and track materials used in the vests.  In fact, these procedures were a primary reason that DHB was originally awarded the contract and the U.S. government paid an extra $50 per vest for these non-existent procedures.

87.     Thus, it is clear that as early as 2001, the Individual Defendants had knowledge of the material defects in DHB's vest products.

## IMPROPER STATEMENTS

88.     The Individual Defendants by their fiduciary duties of care, good faith and loyalty owed to DHB a duty to insure that the Company's public statements fairly presented, in all material respects, the Company's business prospects, particularly the viability of its body armor products, which is the most important aspect of DHB's business, as well as all other issues material to the Company's operations.  In order to adequately carry out these duties, it is necessary for the Individual

Defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements.  Defendants Brooks, Hatfield, Ellis and Schlegel, as officers of DHB, had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports.  Moreover, defendants Brooks, Schlegel, Krantz, Nadelman, Chasin, Berkman and Ellis, as directors of DHB had ample opportunity to discuss this material information with management and fellow directors at any of the more than at least 20 Board meetings that occurred during the relevant period as well as at meetings of Committees of the Board.  Despite these duties, the Individual Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the following improper statements to be disseminated by DHB to the investing public and the Company's shareholders.

89.     On March 15, 2004, the Individual Defendants caused or allowed DHB to hold a conference call wherein defendant Brooks stated in part:

> ***The foundation for the company is solid***.  Now we can aggressively build DHB to the company I've always envisioned.  The company posted record results in virtually every measure of performance.  But and I mean but, ***this is only the beginning for us***.  Our goal is to intensify momentum, increase profitability and enhance shareholder value.  ***Just like night fishing***.  ***The lights have been turned on***.  ***The little fish are coming to the light***.  ***Now the big fish are coming for the little fish***.  ***It's like a feeding frenzy***.

90.     On March 24, 2004, the Individual Defendants caused or allowed DHB to issue a press release entitled "DHB Industries Awarded $77 Million DOD Contract."  The press release stated in part:

> DHB Industries Inc., the market leader in the rapidly growing protective body armor industry, announced today that its wholly owned subsidiary, Point Blank Body Armor, Inc. ("Point Blank"), has been awarded a $77 million contract for body armor for the United States Military.  Point Blank believes this is the largest single contract for body armor ever awarded by the U.S. Department of Defense.
>
> ***The Company received the $77 million award for Point Blank's "Interceptor" Outer Tactical Vest (OTV).  Point Blank is currently the major supplier of outer tactical vests to the United States Armed Forces***.

This brings the total new DOD contacts and purchase orders announced by DHB Industries over the past four months to $142 million....

Commenting on the announcement, Sandra Hatfield, Chief Operating Officer of DHB Industries, said, "***This contract award demonstrates the U.S. Department of Defense's continued confidence in Point Blank's ability to deliver life-saving body armor systems to the armed forces of the United States***. ***We will continue to provide exceptional products that exceed the requirements and expectations of the United States Military while also providing unmatched service and support***."

91.     On April 1, 2004, the Individual Defendants caused or allowed DHB to issue a press release entitled "DHB Industries Announces $12 Million in New Orders."  The press release stated in part:

DHB Industries Inc. ... announced today that it has received more than $12 million in new purchase and delivery orders within the past week.

Total backlog of firm orders in hand currently stands at a record $203 million, a 54% increase as compared to total backlog of firm orders in hand of $132 million on March 1, 2004.

Today's announcement brings the total new contracts and purchase orders announced by DHB Industries since November 2003 to $154 million.  Last week, DHB announced that its wholly owned subsidiary, Point Blank Body Armor, Inc. ("Point Blank"), had been awarded a $77 million contract from the United States Military for its "interceptor" Outer Tactical Vest (OTV).  Point Blank believes this is the largest single contract for body armor ever awarded by the U.S. Department of Defense. ***Point Blank is currently the major supplier of outer tactical vests to the United States Armed Forces***.

Commenting on the announcement, Sandra Hatfield, Chief Operating Officer of DHB Industries, said, "***The momentum of new purchase orders coming into DHB is continuing at a record pace from all market sectors***. ***We believe this is a result of both strong worldwide demand for protective body armor coupled with DHB's proven ability to fulfill this demand with the industry's leading products and unparallel[ed] customer service and support***."

92.     On April 21, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "Shareholder Derivative Lawsuit Against DHB Industries Discontinued."  The press release stated in part:

DHB Industries Inc., the market leader in the rapidly growing protective body armor industry, announced today a second shareholder derivative action against DHB and six of its officers and directors brought in October of 2002 has been discontinued with prejudice. On March 13, 2003, DHB announced the dismissal of another shareholder derivative action against DHB and six of its officers and directors brought by the Plumbers & Pipefitters Local 112 Pension Fund in October of 2002.

- 45 -

With the conclusion of this suit, there are no remaining shareholders or derivative lawsuits outstanding against DHB.

Commenting on the end of the lawsuit, David H. Brooks, Chief Executive Officer of DHB Industries Inc. stated, ... "We will continue to focus on producing the best protective soft body armor in the world and maximizing shareholder value."

93.     On April 29, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled, "DHB Industries Announces Record $215+ Million Backlog."  The press release stated in part:

Company Announces $25 Million In New Orders Received Within the Past Week

DHB Industries Inc., the market leader in the rapidly growing protective body armor industry, announced today that the total backlog of firm orders in hand currently stands at a record $215+ million. During the past week, DHB's Armor Group has received more than $25 million in new purchase and delivery orders. Today's announcement brings the total new contracts and purchase orders announced by DHB Industries since November 2003 to $179 million.

Commenting on the announcement, Sandra Hatfield, Chief Operating Officer of DHB Industries, said, "The demand for the Armor Group's products continues at an unprecedented pace. We continue to receive new purchase orders from every market sector, *reflecting the strength of DHB's technology*, *products and our ability to handle very large volumes*. Our expansion efforts are clearly showing early dividends as we continue to provide exceptional life-saving products that exceed the requirements and expectations of our customers while providing unparalleled levels of service and support."

DHB Armor Group expanded its operations last week to accommodate the surging growth in its Armor Group by opening a third facility in South Florida to increase capacity and improve efficiency. The new 104,000 square foot manufacturing plant will dramatically improve the Armor Group's flexibility to fulfill its current backlog. The Armor Group maintains two additional Florida facilities in Oakland Park and Deerfield Beach, plus a facility in Jacksboro, Tennessee.

94.     On May 6, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "DHB Industries Announces Record First Quarter Revenue of $74.4 Million and Record Earnings of $0.14 Per Share."  The press release stated in part:

In April 2004, *DHB expanded its operations to accommodate the steep trajectory of growth* in its Armor Group by opening a third manufacturing facility in South Florida. The new 104,000 square foot manufacturing plant located in Pompano Beach will enhance the Armor Group's ability to increase production and improve workflow and efficiency. The Armor Group maintains two additional Florida facilities in Oakland Park and Deerfield Beach, plus a facility in Jacksboro, Tennessee.

Dawn Schlegel, CFO of DHB Industries, commented, "The Company met or exceeded during the first quarter all of its operating goals which it previously provided as guidance to the financial community on March 15th. Selling, general and administrative expenses declined from the second half of 2003, as expected, due to a significant decline in extraneous operating expenses. The balance sheet continued to strengthen as shareholders' equity increased by $6.3 million in the quarter."

David Brooks, Chairman and CEO of DHB Industries, added, "***DHB Industries' leading position in the protective soft body armor industry has never been more pronounced. In the past six months, DHB has received two significant contracts for body armor from the United States Military, $60 million and $77 million***, each of which the Company believes was the largest single contract for body armor ever awarded by the U.S. Department of Defense at the time of award. To date, our Point Blank subsidiary, providing life-saving protection for our troops, has shipped more than 600,000 Interceptor Outer Tactical Vests to the US military."

Mr. Brooks continued, "***Order activity from all four segments of business - military***, ***law enforcement***, ***federal agencies and international is expanding at record levels***. We are particularly enthused with the current activity and future growth prospects in the international markets. We have significantly expanded our production capacity with the opening of our new 104,000 sq. ft. plant in Pompano Beach. ***The future outlook for DHB is exciting and rewarding given the increased need for homeland security***, ***the continuing war on terror and the unstable geopolitical environment***."

Guidance and Outlook:

DHB continues to experience significant demand for its industry-leading protective soft body armor products. Given current visibility, the Company expects to report revenues of at least $80 million for the second quarter of 2004. ***Moreover***, ***the Company is raising its previous guidance***, ***and now expects revenues of at least $275 million for the full 2004 year***.

95.      On May 10, 2004, the Individual Defendants caused or allowed the Company to file

its 10-Q for Q1:04.  The 10-Q was signed by defendants Brooks, Schlegel, Krantz and Nadelman.

The 10-Q stated in part:

The Company's market share is highly dependent upon the quality of its products and its ability to deliver its products in a prompt and timely fashion.

\* \* \*

Management's current strategic focus is on quality and delivery, which management believes are the key elements in obtaining additional and repeat orders under the Company's existing procurement contracts with the U.S. military and other governmental agencies.

\* \* \*

ITEM 4. CONTROLS AND PROCEDURES

The Company carried out an evaluation, as required by Rule 13a-15(b) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-14 and 15d-14 of the Exchange Act) as of the end of the period covered by this report. Based upon that evaluation, *the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective in timely alerting them to material information relating to the Company* (including its consolidated subsidiaries) required to be included in the Company's periodic SEC filings. During the period covered by this report, the Company has continued to implement certain changes to its internal control over financial reporting as described below, which have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

96.     The 10-Q also contained certifications pursuant to sections 302 and 906 of the

Sarbanes-Oxley Act of 2002, signed by defendants Brooks and Schlegel.

## CERTIFICATION OF CHIEF EXECUTIVE OFFICER

I, David H. Brooks, Chairman and Chief Executive Officer of the Company, certify hat:

1. I have reviewed this quarterly report on Form 10-Q of DHB Industries, Inc.;

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

   a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

   b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and

   c) presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

   a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officer and I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: May 10, 2004

/s/ DAVID H. BROOKS
_____

David H. Brooks

President and Chief Executive Officer

### CERTIFICATION OF CHIEF FINANCIAL OFFICER

I, Dawn M. Schlegel, Chief Financial Officer of the Company, certify that:

1. I have reviewed this quarterly report on Form 10-Q of DHB Industries, Inc.;

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

   a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and

c) presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officer and I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: May 10, 2004

/s/ DAWN M. SCHLEGEL

_____

Dawn M. Schlegel

Chief Financial Officer

EXHIBIT 32.1

CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of DHB Industries, Inc. (the Company") on Form 10-Q for the period ended March 31, 2004 as filed with the securities and Exchange Commission on the date hereof (the "Report"), I, David H. Brooks, Chairman and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. ss. 1350, as adopted pursuant to ss. 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: May 10, 2004

By: /s/ DAVID H. BROOKS

_____

David H. Brooks

Chairman and Chief Executive Officer

This certification accompanies this Report on Form 10-Q pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and shall not, except to the extent required by such Act, be deemed filed by the Company for purposes of Section 18 of the Securities Exchange Act of 1934, as amended.

EXHIBIT 32.2

CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of DHB Industries, Inc. (the "Company") on Form 10-Q for the period ended March 31, 2004 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Dawn M. Schlegel, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. ss. 1350, as adopted pursuant to ss. 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: May 10, 2004

By: /s/ DAWN M. SCHLEGEL

_____

Dawn M. Schlegel

Chief Financial Officer

This certification accompanies this Report on Form 10-Q pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and shall not, except to the extent required by such Act, be deemed filed by the Company for purposes of Section 18 of the Securities Exchange Act of 1934, as amended.

97.     On June 8, 2004, the Individual Defendants caused or allowed the Company to issue a

press release entitled "DHB Industries Announces $239.4 Million Contract – Award Is the Largest

Contract for Armor Ever Issued in the History of Body Armor – Company's Backlog Swells to a

Record $415 Million."  The press release stated in part:

David Brooks, Chairman and CEO of DHB Industries, proudly announced today that the Company has been awarded a contract for its recently developed Dorsal Axillary Protection System (D.A.P.S.) from the U.S. Army Robert Morris Acquisition Center. The contract value is an astounding $239,400,000 covering three years.

"This order has an enormous impact on DHB as it marks an entirely new segment of business and product line to complement our existing Interceptor Body Armor sold to the U. S. military and its industry leading soft armor systems sold to law enforcement and federal agencies. Moreover, the contract provides a substantial guaranteed base of business for the next three years and will allow for immediate higher utilization of our recently opened 104,000 sq. ft. Pompano Beach, Florida manufacturing facility," stated David Brooks.

Sandra Hatfield, Chief Operating Officer of DHB Industries, commented, "*We are proud of our rapid response to the needs of our customer in designing, developing and producing this latest addition to the Interceptor Outer Tactical Vest*. This product is a testament to our industry-leading research and development efforts. *We remain committed to fulfilling the needs of our customers, which has been the cornerstone of the success and growth of our Company*."

Combat actions in Operation Iraqi Freedom have revealed an increased threat from the extensive use of improvised explosive devices (IED's) by terrorist insurgents. While Point Blank's Interceptor Outer Tactical Vest provides unparalleled protection to the torso from the fragmentary effects of IED's, its newly developed D.A.P.S. system provides additional protection by shielding the under arm, shoulder and upper arm areas not currently covered by Interceptor with the same level or protection. Point Blank Body Armor began development of D.A.P.S. to fully integrate with the Interceptor OTV System in early May 2004.

Point Blank believes this is the largest single contract for armor ever awarded in the history of the body armor industry. This brings the total new DOD contracts and purchase orders announced by DHB Industries over the past eight months to $381 million and increases the Company's total current backlog to a record $415 million.

98.     On August 5, 2004, the Individual Defendants caused or allowed the Company to issue

a press release entitled "DHB Industries Announces Record 2nd Quarter Revenue of $86 Million and

Record Earnings of $0.17 Per Share."  The press release stated in part:

Second Quarter Highlights:

• On June 8, 2004, DHB Industries announced what it believes to be the largest single contract for armor ever awarded in the history of the body armor industry. The contract, valued at $239.4 million over three years, was awarded by the U.S. Army Robert Morris Acquisition Center for DHB's recently developed Dorsal Axillary Protection System (D.A.P.S.). D.A.P.S. is an entirely new business and product line that complements DHB's Interceptor Body Armor currently being sold to the U. S. military which provides the same level of ballistic protection to areas not currently covered by Interceptor, including the under arm, shoulder and upper arm areas.

•    In April 2004, DHB expanded its operations to accommodate the rapid growth in its Armor Group by opening a third manufacturing facility in South Florida. The new 104,000 square foot manufacturing plant located in Pompano Beach has enhanced the Armor Group's ability to increase production and improve workflow and efficiency. The Armor Group maintains two additional Florida facilities in Oakland Park and Deerfield Beach, plus a facility in Jacksboro, Tennessee.

Dawn Schlegel, CFO of DHB Industries, commented, "During the second quarter, *the Company once again met or exceeded all of its operating goals which it previously provided as guidance to the financial community on May 6, 2004*. The four income statement items that we deem most important net sales, gross margins, selling, general and administrative expenses and operating margins all met or exceeded our expectations. We are beginning to realize significant operating and earnings leverage as our sales increase. *Moreover, the balance sheet continues to strengthen as stockholders' equity has increased by 30% since December 31, 2003*."

*David Brooks, Chairman and CEO of DHB Industries, added, "DHB Industries continues to experience extraordinary growth as order activity from all four sectors of business - military, law enforcement, federal agencies and international - has been expanding at a rapid pace for more than a year*. Over the past ten months, DHB has announced new contracts and purchase orders totaling more than $415 million. To date, our Point Blank subsidiary, providing life-saving protection for our troops, has shipped more than 750,000 Interceptor Outer Tactical Vests to the US military. *We believe the future outlook for DHB and its industry leading soft body armor products remains exceptionally strong*."

Guidance and Outlook:

DHB continues to experience accelerating demand for its industry-leading protective soft body armor products. The Company is raising its previous guidance, and now expects revenues of at least $300 million for the full 2004 year.

99.     On August 9, 2004, the Individual Defendants caused or allowed the Company to issue its 10-Q for Q2:04.  The 10-Q was signed by defendants Brooks, Schlegel, Krantz and Nadelman.  The 10-Q stated in part:

*The Company believes it is now recognized by government agencies as having the ability to manage larger contracts*.

*Management's current strategic focus is on quality and delivery*,

ITEM 4. CONTROLS AND PROCEDURES

The Company carried out an evaluation, as required by Rule 13a-15(b) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-14 and 15d-14 of the Exchange Act) as of the end of the period covered by this report. *Based upon that evaluation, the Chief Executive Officer and*

- 53 -

***Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective in timely alerting them to material information relating to the Company (including its consolidated subsidiaries) required to be included in the Company's periodic SEC filings****. During the period covered by this report, the Company has continued to implement certain changes to its internal control over financial reporting as described below, which have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.*

100.    The 10-Q for Q2:04 also contained certifications submitted pursuant to §§ 906 and 302 of the Sarbanes-Oxley Act of 2002, signed by defendants Brooks and Schlegel, using language virtually identical to the certification filed with the Company's 10-Q for Q1:04.

101.    On October 5, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled, "DHB Industries Announces $35+ Million In New Orders."  The press release stated in part:

> DHB Industries Inc., the market leader in the rapidly growing protective body armor industry, announced today that its Armor Group has recently received new purchase and delivery orders for a wide variety of its protective products in excess of $35 million from various branches of the United States Military, Federal Government and Domestic Law Enforcement Agencies.
>
> Sandra Hatfield, Chief Operating Officer of DHB Industries commented, "***DHB's Armor Group continues to experience a strong level of demand for a wide variety of its superior life-saving products****. **We are pleased and proud of our reputation for serving the needs and expectations of our customers***. These new orders substantiate the confidence of our customers in DHB Armor Group's products and underscore our focused strategy and continuing opportunities for growth."

102.    On October 29, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled, "DHB Industries Announces $19 Million In New Orders."  The press release stated in part:

> DHB Industries Inc., the market leader in the rapidly growing protective body armor industry, announced today that its Armor Group has recently received new purchase and delivery orders for a wide variety of its protective products in excess of $19 million from various branches of the United States Military, Federal Government and Domestic Law Enforcement Agencies. These new orders follow directly on the heels of $35+ Million in new orders announced by the Company on October 5, 2004.
>
> Sandra Hatfield, Chief Operating Officer of DHB Industries commented, "***We continue to provide exceptional products and service that exceed the requirements and expectations of our customers****. **These purchase and delivery orders substantiate the confidence and demand for DHB Armor Group's products and underscore our ability to provide unparalleled levels of service and support***."

103.    On November 4, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled, "DHB Industries Receives $24.6 Million Order."  The press release stated in part:

> DHB Industries Inc., the market leader in the rapidly growing protective body armor industry, announced today that its Armor Group has received a purchase and delivery order in the amount of $24.6 Million from the U.S. Mission Iraq. This brings the total new orders announced by the Company to $78.6 Million over the last thirty days. The Company previously announced $19 Million in new orders on October 29, 2004 and $35+ Million in new orders on October 5, 2004.
>
> Sandra Hatfield, Chief Operating Officer of DHB Industries commented, "It is important to note that the orders received over the last thirty days are for non-Interceptor™ products. We are now beginning to realize growth from the planning and development of new products, targeted for new markets. U. S. Mission Iraq's order represents a modified commercial product, and was specifically designed to meet their unique requirements. This is yet another example of DHB's innovation, diversification of products, and manufacturing capabilities to accommodate new and emerging markets. ***Our growth has surged on the principles of listening and responding to our customers in order to provide a superb quality product on-time, every time***. Building on this foundation will continue to drive DHB's phenomenal growth."

104.    On November 9, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "DHB Industries Achieves Record Third Results."  The press release stated in part:

> Third Quarter Highlights:
>
> •    In the third quarter of 2004, DHB Industries began shipping on its recently announced three-year, $239.4 million purchase contract from the US Army for DHB's new Dorsal Axillary Protection System (D.A.P.S.). D.A.P.S. is an entirely new product line that is complementary to ***DHB's enormously successful Interceptor™ Outer Tactical Vest***, which provides the same level of ballistic protection to areas of the body not covered by the Interceptor™, specifically including the underarm, shoulder and upper arm.
>
> •    Since October 5, 2004, DHB has announced new purchase and delivery orders totaling $78.6 million, including a $24.6 million order from the US Mission Iraq for body armor for Iraqi military and law enforcement personnel. All of the $78.6 million of new orders were for body armor products other than Interceptor™ vests.
>
> ***Sandra Hatfield, COO of DHB Industries, commented, "We continue to meet or exceed all of our internal operating and performance goals. Our base of business is strengthening in all segments -- military, state and local law enforcement, and federal agencies -- and we believe we are increasing market share in all segments***. We are especially encouraged by substantial orders we have

recently received that are either for new products or are from new customers. Lastly, we are extremely excited about the prospects of a number of R&D initiatives as well as new products currently in either prototype or field testing stage."

David Brooks, Chairman and CEO of DHB Industries, added, "***Our strength, commitment and leadership position within the body armor industry is extremely strong***. Over the past year, DHB has announced new contracts and purchase orders totaling more than $525 million. As of September 30, 2004, our Point Blank subsidiary, providing life-saving protection for our troops, has shipped more than 800,000 Interceptor(TM) Outer Tactical Vests to the US military. The surging operating performance and earnings leverage of the Company is largely a result of the significant investments we made over the past three years in R&D, expanding our manufacturing capacity by opening two new facilities totaling over 150,000 square feet, and significantly increasing our base of versatile employees. ***As we look to the future outlook of DHB***, ***I can only say***, ***this is just the beginning***, ***the future is ours***."

Guidance and Outlook:

DHB continues to experience accelerating demand for its industry-leading protective body armor products. The Company is raising its previous guidance, and now expects revenues of at least $330 million for the full 2004 year.

105.    On November 9, 2004, the Individual Defendants caused or allowed the Company to issue its 10-Q for Q3:04.  The 10-Q was signed by defendants Brooks, Schlegel, Krantz and Nadelman.  The 10-Q stated in part:

The Company's market share is highly dependent upon the quality of its products and its ability to deliver its products in a prompt and timely fashion.

***Management's current strategic focus is on quality and delivery***, which management believes are the key elements in obtaining additional and repeat orders under the Company's existing procurement contracts with the U.S. military and other governmental agencies.

ITEM 4. CONTROLS AND PROCEDURES

The Company carried out an evaluation, as required by Rule 13a-15(b) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-14 and 15d-14 of the Exchange Act) as of the end of the period covered by this report. ***Based upon that evaluation***, ***the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective in timely alerting them to material information relating to the Company (including its consolidated subsidiaries) required to be included in the Company's periodic SEC filings***. During the period covered by this report, the Company has continued to implement certain changes to its internal control over financial reporting as described below, which have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

106.    The 10-Q for Q3:04 also contained certifications submitted pursuant to §§ 906 and 302 of the Sarbanes-Oxley Act of 2002, signed by defendants Brooks and Schlegel, using language virtually identical to the certification filed with the Company's 10-Q for Q1:04.

107.    Within weeks of the highly favorable November 9, 2004 press release announcing that DHB had raised its guidance for the Company's FY:04 earnings, defendant Hatfield signed the Waiver acknowledging the defects in the intercept vests on November 30, 2004.  On November 29, 2004 and November 30, 2004, every one of the Insider Selling Defendants had enormous Company stock sales.  Chasin sold 108,496 shares of DHB stock for proceeds of $2,063,126.56 (68% of his shares).  Schlegel sold 149,503 shares of DHB stock for proceeds of $2,931,753.83 (over 65% of her shares).  Krantz sold 116,226 shares of DHB stock for proceeds of $2,251,557.36 (over 64% of his shares).  Hatfield sold 180,119 shares of DHB stock for proceeds of $3,532,133.59 (50% of her shares).  Nadelman sold 102,374 shares of DHB stock for proceeds of $2,007,554.14 (over 45% of his shares).  Berkman sold 44,620 shares of DHB stock for proceeds of $864,748.20 (sold over 19% of his shares).  None of these defendants had ever sold any of their DHB stock prior to this massive sell-off.  Brooks also sold 3.7 million shares of DHB stock for proceeds of almost $70 million.  In all, the Insider Selling Defendants, who consist of the entire Board at the time and the COO, sold over *$83 million* in Company stock and the sales occurred when DHB stock was at its then all time high.

108.    On December 23, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled, "DHB Industries Awarded Contract with City of Baltimore."  The press release stated in part:

> DHB Industries Inc., the market leader in the rapidly growing protective body armor industry, announced today that its wholly owned subsidiary, Point Blank Body Armor, Inc. ("Point Blank" - http://www.pointblankarmor.com), has been awarded a four year, renewable contract to provide soft body armor to the City of Baltimore, Maryland. This contract is part of a cooperative purchasing agreement that includes surrounding cities and counties and allows these participants to purchase armor from the same contract.

Sandra Hatfield, Chief Operating Officer of DHB Industries, commented, "In Point Blank's 30 year history, this is the first contract with the City of Baltimore and we welcome the opportunity to provide them with world class products and unsurpassed customer service. DHB continues to build upon its dominant position in all markets, while positioning ourselves to capture increasingly significant shares of those markets. This is yet another testament to our commitment of maintaining and growing our position of leadership in the industry."

109.    On December 23, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled, "DHB Industries Receives $100 Million Delivery Order — Interceptor™ OTV Delivery Order Largest in History of Soft Body Armor —."  The press release stated in part:

DHB Industries Inc., the market leader in the rapidly growing protective body armor industry, announced today that its wholly owned subsidiary, Point Blank Body Armor, Inc. ("Point Blank" - http://www.pointblankarmor.com), has received the first delivery order against the U.S. Army's contract announced earlier today for Point Blank's Interceptor™ Outer Tactical Vest (OTV). ***The $100 Million delivery order, the largest in the Company's history, is believed to be the largest delivery order in the history of soft body armor***. The Company was notified earlier today that Point Blank was the only successful offeror for this solicitation.

Sandra Hatfield, Chief Operating Officer of DHB Industries, commented, "Today is a historic day for our Company. This first delivery order, with a value of $100 Million, is unprecedented in both the Company's history and the history of the soft body armor industry. This delivery order sets the pace for the Company's phenomenal growth throughout 2005."

110.    On December 23, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled, "U.S. Army Selects DHB Industries for Prestigious Contract."  The press release stated in part:

— Interceptor™ OTV Award Marks Significant Milestone For Point Blank Subsidiary —

— Contract Awarded Exclusively to Point Blank Body Armor —

— Company Backlog Soars - Now Exceeds Unprecedented Half-Billion Dollars —

DHB Industries Inc., the market leader in the rapidly growing protective body armor industry, announced today that its wholly owned subsidiary, Point Blank Body Armor, Inc. ("Point Blank" - http://www.pointblankarmor.com), has received notification of a much anticipated, high-profile, three-year contract awarded by the U.S. Army for Point Blank's Interceptor™ Outer Tactical Vest (OTV). The Company was also notified that Point Blank was the only successful offeror for this solicitation.

With this announcement, the Company's total backlog of orders and contracts now exceeds an unprecedented half-billion dollars.

Commenting on the announcement, David Brooks, Chairman and CEO of DHB Industries, said, "***This major military award is a significant milestone for the Company representing the catalyst that will propel and sustain us into the future as the clear***, ***preeminent leader in the design***, ***development and production of technologically superior life-saving body armor systems***. The Company continues to build upon its dominant position while maintaining a commanding share of the military market. The future outlook for DHB appears outstanding given the continuing war on terror and the increased need for homeland security. We are totally committed to maintaining our position of leadership and expect to continue to capture increasingly significant shares of the market."

Sandra Hatfield, Chief Operating Officer of DHB Industries, added, "This contract award is extremely humbling with the knowledge that the Department of Defense puts this much faith in our Company and its products. We have an enormous sense of pride that our products are protecting and saving the lives of our men and women serving in the armed forces. ***The Interceptor™ OTV award demonstrates the U.S. Department of Defense's confidence in Point Blank's ability to deliver life-saving body armor systems to the armed forces of the United States***. ***Simply stated***, ***this puts us in a league of our own as the world's premier provider of protective solutions surpassing our customers expectations***."

U.S. Armed Forces worldwide are currently wearing Point Blank's Interceptor™ OTV. It was developed to exceed the rigorous standards set by the U.S. Marine Corps, and subsequently adopted by the U.S. Army and U.S. Air Force. Numerous soldiers serving in Iraq and Afghanistan have credited the Interceptor™ OTV with saving their lives. In a recently published news report, Major General Kevin C. Kiley at the Walter Reed Army Medical Center and Captain Michael J. Krentz, Deputy Commander of the National Naval Medical Center, said, "High-tech body armor and state-of-the-art battlefield medical procedures are keeping more seriously wounded soldiers alive than ever before."

111. Contemporaneous with these December 23, 2004 announcements of a new deal and a deal of record size, and less than a month after defendant Hatfield signed the waiver acknowledging that DHB's Interceptor vests were failing quality testing, defendants Brooks and Hatfield dumped over $117 million in DHB stock over a one week period. Shortly thereafter, the stock began to tumble slowly from its high share price of around $20 dollars to its current value of around $5 dollars.

112. On March 16, 2005, the Individual Defendants caused or allowed the Company to issue a press release entitled "DHB Industries Posts Record Fourth Quarter Results." The press release ***did not mention Hatfield's Waiver***, and stated in part:

Fourth Quarter Highlights:

•       DHB's subsidiary, Point Blank Body Armor, Inc. ("Point Blank"), was the only recipient of a three-year contract awarded in December 2004 by the U.S. Army for Point Blank's Interceptor™ Outer Tactical Vest (OTV). DHB received an initial delivery order on the award valued at $100 million on December 23, 2004.

•       In December 2004, DHB appointed U.S. Army 4-Star General (Ret.) Larry R. Ellis to its Board of Directors.

•       During the fourth quarter of 2004, DHB continued shipments on a three-year, $239.4 million purchase contract it was awarded in June 2004 from the U.S. Army for the new Deltoid Auxiliary Protection System (D.A.P.S.). D.A.P.S. is an entirely new product line that is complementary to DHB's Interceptor™ Outer Tactical Vest, which provides ballistic protection to areas of the body not covered by the Interceptor™, including the under-arm, shoulder and upper arm.

•       In the fourth quarter, DHB announced new purchase and delivery orders totaling $178.6 million, including a $24.6 million order from the U.S. Mission Iraq for body armor for Iraqi military and law enforcement personnel.

        Sandra Hatfield, COO of DHB Industries, commented, "During the fourth quarter, *we continued to produce and deliver body armor at a record pace, meeting all of our internal operating and performance goals*. Moreover, our success as the sole recipient of the U.S. Army OTV contract awarded in December capped a fourth quarter and full year of extraordinary effort by our company and our people. Our business has grown in all segments -- military, state and local law enforcement, and federal agencies."

        David Brooks, Chairman and CEO of DHB Industries, added, "During the 2004 full year, DHB announced new contracts and purchase orders totaling approximately $544 million. We have seen our backlog increase over the past three years from $57 million in March 2003, to $132 million in March 2004, to $415 in March 2005. Our Point Blank subsidiary, providing life-saving protection for our troops, has shipped more than 850,000 Interceptor™ Outer Tactical Vests to the U.S. military. Whereas our recent growth has been exceptional, we seek additional opportunities to both expand existing market share and enter new geographic markets."

Guidance and Outlook:

        *Given our existing backlog and the current demand for our products, we anticipate revenues will increase in 2005 as compared to 2004.*

        113.    On March 17, 2005, the Individual Defendants caused or allowed the Company to file a Form 10-K/A with the SEC.  The 10-K/A was signed by defendants Brooks, Schlegel, Krantz, Nadelman, Berkman, Chasin and Ellis.  The filing contained the following statement:

        *Management's current strategic focus is on quality and delivery*, which management believes are the key elements in obtaining additional and repeat orders

under the Company's existing procurement contracts with the U.S. military and other governmental agencies.

In response to these shortages, we have adopted a policy of purchasing such materials based on their availability rather than our immediate need for such materials. This policy is designed to mitigate the effects of any future shortages; however, it will also increase our inventory carrying costs.

\* \* \*

On January 3, 2005, a class action lawsuit was filed against us in the Circuit Court of the Seventeenth Judicial Circuit in Broward County, Florida by a police organization and individual police officers, because of *concerns regarding the effectiveness and durability of body armor with high concentrations of Zylon® in the Company's bullet-resistant soft body armor (vests)*.  In February 2005, we reached a preliminary settlement with respect to the class action lawsuit filed, subject to final court approval.  *The Company does not expect this settlement to have a material adverse effect on its financial position*.

\* \* \*

The Company's market share is highly dependent upon the quality of its products, and its ability to deliver its products in a prompt and timely fashion.

114.    The 10-K for FY:04 also contained certifications submitted pursuant to §§ 906 and 302 of the Sarbanes-Oxley Act of 2002, signed by defendants Brooks and Schlegel, using language virtually identical to the certification filed with the Company's 10-Q for Q1:04.

115.    On April 15, 2005, the Individual Defendants caused or allowed the Company to file a Form 8-K with the SEC entitled "Change in Accountant."  The filing stated in part:

On April 8, 2005, DHB Industries, Inc. (the "Company") was notified that *Weiser LLP ("Weiser") had declined to stand for re-election as the Company's principal independent accountants*.  Weiser had served as the Company's principal independent accountants since August 27, 2003.  Notwithstanding its decision not to stand for re-election, Weiser has advised the Company that it intends to complete its audit of the Company's internal control over financial reporting as of December 31, 2004 and upon completion of such audit, to provide its opinion regarding such controls as of such date (the "Weiser Opinion").

116.    On May 10, 2005, the Individual Defendants caused or allowed the Company to issue a press release entitled "DHB Industries Reports First Quarter Results."  The press release stated in relevant part:

Sandra Hatfield, DHB's Chief Operating Officer, said, "We are pleased with the Company's financial performance for the first quarter. The Company had its best

first quarter ever with revenues of over $85 million. We continue to work hard to service our customers and provide them with the best possible body armor."

David H. Brooks, DHB's Chief Executive Officer, said, "Last week we announced that Retired Army Four Star General Larry Ellis was named President of DHB. Gen. Ellis had a long and distinguished career of service to our country and we are very fortunate to now call him a senior member of our management team. His leadership, integrity and organizational skills will be a great asset to the Company. I believe the experience General Ellis brings will be a tremendous asset to the Company and its future."

General (Ret.) Ellis said, "I am excited about joining DHB and the opportunity to again serve those in uniform in a different capacity. I have been impressed with the dedication and professionalism of our employees. Just as importantly, I am proud and impressed with the quality of our products. Our products perform where it matters; in the field and in combat."

117.    On May 10, 2005, the Individual Defendants caused or allowed the Company to issue

its 10-Q for Q1:05.  The 10-Q was signed by defendants Brooks and Schlegel.  The 10-Q stated in

part:

Our ability to maintain recent revenue levels will be highly dependent on continued demand for our body armor and projectile-resistant clothing. Although we do not foresee an immediate material reduction in such demand

\* \* \*

***Our current strategic focus is on quality and delivery***, ***which we believe are the key elements in obtaining additional and repeat orders under our existing procurement contracts with the U.S. military and other governmental agencies***.

\* \* \*

EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES

\* \* \*

Based upon the disclosure controls and procedures evaluation, ***our CEO and CFO have concluded that***, ***as of the end of the period covered by this report***, ***our disclosure controls and procedures were effective*** to ensure that information required to be disclosed in our reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and that information required to be disclosed in our reports filed under the Exchange Act is accumulated and communicated to our management, including the CEO and CFO, as appropriate to allow timely decisions regarding required disclosure accumulated and communicated to our management, including the CEO and CFO, as appropriate to allow timely decisions regarding required disclosure.

118.    The 10-Q for Q1:05 also contained certifications submitted pursuant to §§ 906 and

302 of the Sarbanes-Oxley Act of 2002, signed by defendants Brooks and Schlegel, using language

virtually identical to the certification filed with the Company's 10-Q for Q1:04.

119.    On August 8, 2005, the Individual Defendants caused or allowed the Company to

issue its 10-Q for Q2:05.  The 10-Q was signed by defendants Brooks, Schlegel, Krantz and

Nadelman.  The 10-Q stated in part:

> Our ability to maintain recent revenue levels will be highly dependent on continued demand for our body armor and projectile-resistant clothing. … we do not foresee an immediate material reduction in such demand…

> *    *    *

> ***Based upon the disclosure controls and procedures evaluation***, ***our CEO and CFO have concluded that***, ***as of the end of the period covered by this report***, ***our disclosure controls and procedures were effective*** to ensure that information required to be disclosed in our reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and that information required to be disclosed in our reports filed under the Exchange Act is accumulated and communicated to our management, including the CEO and CFO.

120.    The 10-Q for Q2:05 also contained certifications submitted pursuant to §§ 906 and

302 of the Sarbanes-Oxley Act of 2002, signed by defendants Brooks and Schlegel, using language

virtually identical to the certification filed with the Company's 10-Q for Q1:04.

121.    On July 28, 2005, the Individual Defendants caused or allowed the Company to issue a

press release entitled "DHB Industries Reports Record Second Quarter 2005 Results."  The press

release stated in part:

> Commenting on the Company's second quarter performance, General (Ret.) Larry Ellis said, "I am very pleased with the progress we've made this past quarter, as we continue to execute on our strategy to become the leading and trusted provider of protective body armor to the U.S. Armed Forces, and our nation's federal, state and law enforcement agencies. ***Our second quarter results are indicative of the ongoing demand for our products and reinforce the quality and reliability that our customers have come to depend upon***. ***The management team at DHB remains focused on driving both top-and bottom-line results and we believe our efforts to strengthen our senior staff***, ***improve business processes and expand our market presence both domestically and internationally will lead to enhanced shareholder value over the long-term***."

Sandra Hatfield, the Company's Chief Operating Officer, said, "*We continue to work very closely with our customers and partners to ensure that our products and services exceed their expectations*. And despite ongoing industry-wide supply issues, we have continued to meet customer demand. I'm encouraged by the strong receptivity our products have received in the market place, and the steps we are taking to drive product innovation."

### THE TRUTH IS REVEALED

122.   The Company's shareholders and the market were shocked when on August 30, 2005, the Individual Defendants caused the Company to issue a press release entitled "DHB Confirms Commitment to Officer Safety."   The title of the press release was the ultimate irony in that it disclosed what the Individual Defendants had previously known about the reliability of DHB's armor vests containing Zylon®.   The press release stated in part:

DHB Industries Inc., operating principally in the growing field of body armor, announced today that although it remains confident in the safety and performance of its body armor products containing Zylon®, *it has discontinued the use of Zylon® in its bullet resistant products on August 24, 2005. The Company has ceased production of all Zylon®-containing bullet resistant products due to the National Institute of Justice's (NIJ) decision to revoke the NIJ's previously issued certifications of all vests containing Zylon® in the marketplace*. The Company also announces that it will be implementing a Voluntary Replacement Program to assist its customers who presently have non NIJ-compliant Zylon® body armor.

It is important to note that this Voluntary Replacement Program is not a product recall. *This action is a result of the de-certification by the NIJ of body armor with Zylon®, which will result in certain customers having body armor that will not be in compliance with the new NIJ requirements*. This program will assist the law enforcement community in replacing its Zylon® body armor with NIJ-compliant body armor.

"We will diligently work with our customers to address these issues. Officer safety is and will remain our number one priority," stated General (Ret.) Larry Ellis, DHB's President. He continued, "It is our intent to work with the law enforcement community to supply them with replacement vests as rapidly as possible. We encourage all those presently using bullet resistant body armor containing Zylon® to continue wearing their body armor as recommended by the Department of Justice, until their vest have been replaced or exchanged. We believe that, based upon testing and research, that our vests are safe for use by officers in the field."

The Company will record a charge to third quarter earnings to account for the anticipated cost of the Zylon® Replacement Program and discontinued sales of products that contain Zylon®. *The amount of the third quarter charge has not yet been finalized, but is not expected to exceed $60 million*.

- 64 -

123.   On this news, the Company's market capitalization was devastated by over 24%, a far cry from the all-time high share price of over $20 per share, at which the Insider Selling Defendants dumped over 10 million of their personal shares in order to reap proceeds of over $201 million.

124.   In the Company's 10-Q for Q3:05, details of the $60 million dollar charge were further revealed.  The 10-Q stated in part:

> The cost of the vest replacement program is a separate line item under selling, general and administrative expenses, for a total pre-tax charge of $60,000,000, or ($0.76) per diluted share after tax charge, as a result of the Company's voluntary Zylon® vest replacement program announced in August 2005. The composition of this charge is as follows: a $36,700,000 reserve for vests containing Zylon®, the write-off of approximately $19,200,000 in Zylon® inventory, and a $4,100,000 increase in the accounts receivable allowance.

125.   The charge completely wiped out the Company's previously reported income for the year.  In the Company's 10-Q for Q2:05, net income was reported as 15,397,000 for the first six months of FY:05.  In the Company's 10-Q for Q3:05, which reflected the charge, Net income for the first nine months of FY:05 was -42,552,000.

126.   As a result of the Individual Defendants wrongful actions, on March 17, 2006, the Company was required to file an NT 10K (NOTIFICATION OF LATE FILING) announcing the Company was unable to timely file it 10-K for FY:05.  The NT 10K stated in part:

> **The Company did not file its Form 10-K** by March 16, 2006 because **the Company is conducting  additional analysis of historical information and records to ensure the reasonableness of estimates and the accuracy of reported  inventory levels and resulting gross profit and income levels for 2005.  Our auditors have called our attention to, and the Company has identified, some inaccurate inventory records.** The net result is not yet known. Based on the foregoing and information  that has become  available in the fourth quarter of 2005,  **the Company is also  reassessing its estimates of the cost of the Voluntary  Replacement Program for  Zylon®- containing  armor products that the Company  announced in the third quarter of 2005. We believe that both of the analyses could result in restatement of the reported  results for one or more of the first three  quarters of 2005,  including restatement  of the amount of the inventory written off in the third quarter.**

* * *

*The Company anticipates a significant change in its 2005 results of operations, when compared with 2004 results, stemming largely from one-time charges associated with the previously announced decision of the National Institution of Justice ("NIJ") to revoke its certifications of all vests containing Zylon® in the marketplace* and as a result of a change in accounting principles. These charges include the write off of Zylon®-containing inventory and the cost of the Voluntary Replacement Program. These changes were previously disclosed in the Company's Report on Form 10-Q for the quarter ended September 30, 2005.

## REASONS THE STATEMENTS WERE IMPROPER

127.    The Individual Defendants caused or allowed the Company to omit the following material nonpublic facts from its press releases, SEC filings and other public statements:

(a)    DHB's Interceptor vests repeatedly failed to meet government contract standards and had critical, life-threatening flaws;

(b)    DHB had never implemented the quality assurance plan that the government was paying an extra $50 per vest for;

(c)    Orders received from the U.S. military were not indicative of the military's confidence in or satisfaction with DHB's products because many of the vests sold and supplied to the military were defective and only accepted due to shortages in body armor;

(d)    DHB was unable to trace vests to lots of raw material which was a major quality control defect;

(e)    DHB had shipped thousands of vests containing high content of Zylon® that because of the defectiveness of Zylon® based vests could not meet DHB's five year warranty on the same vests;

(f)    DHB had accumulated millions of dollars in Zylon® that defendants knew could not be continued to be used in manufacturing DHB's body armor;

(g)    DHB's financial statements were materially false and misleading because they failed to disclose customers' right to return its products because they did not meet the standards

required by DHB's customers and DHB officers had signed waivers acknowledging the products did not meet the standards required by the government;

(h)     Continued sales of its body armor product lines could result in substantial costs based on the potential for liability claims;

(i)     Despite indications of the potentially unsafe and defective nature of its body armor, the Company falsely represented the quality and safety of its body armor products;

(j)     The Company was unprepared to determine the true financial impact of withdrawal of any of its products;

(k)     Shareholder value would be negatively impacted once the true facts about the Company's body armor products became known;

(l)     Optimistic statements regarding DHB's future prospects and profitability were false and misleading because the problems with DHB's various lines of body armor suffered major flaws; and

(m)     The defendants to this action had dumped massive quantities ($227,980,465.76 worth) of their DHB holdings to maximize their profit before the above undisclosed information became public.

## SUBSEQUENT EVENTS

128.     In November 16, 2005, the Marines and Army recalled more than 18,000 body armor vests because they failed ballistic requirements when they were manufactured in 1999-2000.  This recall was in addition to the 5,000 vests recalled by the Marines earlier in 2005.

129.     Less then a week later, on November 22, 2005, the military requested bids from interested manufacturers to produce an improved Interceptor body armor.  The improved Interceptor body armor was intended to replace the body armor currently produced by DHB.

**INTERNAL FINANCIAL CONTROL DEFICIENCIES AND VIOLATIONS OF GAAP**

130.     According to DHB's 10-K filed with the SEC on or about March 17, 2005, defendants Krantz, Nadelman and Chasin were members of the Audit Committee.  Furthermore, as detailed in the 2002 Company Proxy Statement, the Audit Committee's primary duties and responsibilities include monitoring the integrity of the Company's financial reporting process and systems of internal controls. The Audit Committee has had multiple disagreements with their accounting firms in recent years regarding their internal controls and procedures, which has lead to four independent auditors since 2002.  The Audit Committee has caused or allowed Company projections and reported results that were based upon defective presumptions and/or manipulated facts.

131.     In fact DHB's independent certified public accountants, Grant Thornton, quit in 2003 because of the failure of DHB to properly disclose certain related-party transactions, the Company's reliance on substantial outside assistance from outside professionals in preparing the Company's financial statements and understaffing in the Company's accounting and finance department.  At the time it resigned, Grant Thornton had served as the Company's outside auditor for only one year. Prior to Grant Thornton's appointment, the Company's outside auditor was Paritz & Co., which had also resigned over internal control issues at DHB.  On September 2, 2003, the Company filed a Form 8-K selecting Weiser LLP ("Weiser") as their new independent auditor to replace Grant Thornton, but it only held this (apparently) precarious post for a year before it, too, resigned, citing internal control disagreements with DHB management as the reasons for its departure.

132.     On the Company's 10-K/A filed on May 2, 2005, the attestation report of Weiser identified what the Company's latest accounting firm considered to be two additional material weaknesses in internal controls and procedures: (i) failure of the Company to complete consultation with Weiser prior to filing its Form 10-K for the year ended December 31, 2004; and (ii) a need to

enhance and strengthen the Audit Committee to improve the Committee's effectiveness.  On April 8, 2005, DHB was notified that *Weiser declined to stand for re-election as the Company's principal independent accountants*.

133.    Despite being informed by its outside auditors for the past three years that it needed to enhance its internal controls, the Company has still blatantly resisted efforts to strengthen such controls. Indeed the Company has stated as follows with regard to its efforts to strengthen its internal controls:

> Under the supervision and with the participation of our CEO and CFO, our management has evaluated changes in our internal controls over financial reporting that occurred during our last fiscal quarter. Based on that evaluation, *our CEO and CFO did not identify any change in our internal controls over financial reporting that has materially affected*, *or is reasonably likely to materially affect*, *our internal controls over financial reporting*.

134.    In addition, the Company's selection of Rachlin Cohen and Holtz LLP ("Rachlin") as its independent auditors for the year ending December 31, 2005 further affirms the Company's disinterestedness in remedying its internal controls. This is because Rachlin was paid $234,831 in 2004 for consulting services in connection with assisting DHB in documenting internal control policies and $136,037 in audit fees to perform a re-audit of financial statements for the fiscal year ended December 31, 2002. However, as the recent Enron fiasco demonstrates (where Arthur Anderson provided both auditing and consulting services to Enron), there is a potential conflict of interest when an accounting firm performs both auditing and consulting services for the same company.

135.    The Company's Zylon® products suffered from defects which when uncovered would lead to DHB being unable to sell the Zylon® products on hand and resulting in DHB accumulating millions of dollars worth of excess inventory, as well as millions of dollars in undisclosed losses on its liability to customers.  Pursuant to GAAP, the Company was required to accrue for probable losses on the costs of complying with customer warranties on defective products and to evaluate its inventory at

each quarter-end and record losses for the excessive and unsaleable inventory DHB held.  In order to meet their own aggressive earnings estimates, however, the Individual Defendants caused the Company to not record losses on product liabilities nor to take adequate reserves for excess and overvalued inventory.

136.    Ultimately, in the Q3:05, DHB admitted that it will record changes of as much as $60 million to replace its Zylon® containing bullet-resistant products.  Had DHB appropriately reserved for product warranty claims and for excess and defective inventory in prior quarters, such a large charge would have been unnecessary.  Had DHB properly reported its inventory and losses in accordance with GAAP, DHB's gross margins would have been much lower.

137.    Now DHB has stated that it may have to restate part or all of its previously released financial statements for 2005 due to "*inaccurate inventory records*" and potential errors in "***estimates of the cost of the Voluntary Replacement Program for Zylon®-containing armor products that the Company announced in the third quarter of 2005.***"  The $60 million charge and the potential restatements result from violation of accounting principles.

138.    DHB presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(b)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(c)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(d)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(e)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(f)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79);

(g)     The principle that an estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met:

> Information available prior to issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability had been incurred at the date of the financial statements.  It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> The amount of loss can be reasonably estimated.

(FASB Statements of Financial Accounting Standards ("SFAS") No. 5, ¶8).

  (h) The principle that obligations related warranties and product defects are loss contingencies.  (SFAS 4b).

  (i) The principle that:

 A warranty is an obligation incurred in connection with the sale of goods or services that may require further performance by the seller after the sale has taken place. Because of the uncertainty surrounding claims that may be made under warranties, warranty obligations fall within the definition of a contingency in paragraph 1. Losses from warranty obligations shall be accrued when the conditions in paragraph 8 are met.  Those conditions may be considered in relation to individual sales made with warranties or in relation to groups of similar types of sales made with warranties.  If the conditions are met, accrual shall be made even though the particular parties that will make claims under warranties may not be identifiable. (SFAS 24)

  (j) The principle that adequate disclosures be made for contingent losses. (SFAS 5).

  (k) The principle that:

 A departure from cost basis of pricing the inventory is required when the utility of goods is no longer as great as its cost.  Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels or other causes, the difference should be recognized as a loss of the current period.  This is generally accomplished by stating such goods at a lower level commonly designated as *market*.

(Accounting Research Bulletin ("ARB") No. 43, Chapter 4)

  (l) Further, the undisclosed adverse information concealed by defendants during the relevant period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## REASONS THE INTERNAL CONTROLS WERE INADEQUATE

139. The Company suffered from a severe breakdown of its internal accounting controls, which rendered DHB's financial reporting inherently corrupt, subject to manipulation and unreliable, and this problem resulted in materially false and misleading financial statements.

140. In this regard, defendants failed to design and implement an internal control system over the Company's financial reporting processes and this failure allowed the Company, in violation of GAAP, to improperly recognize vendor income.

141. Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: "(A) make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; [and] (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that ... transactions are recorded as necessary ... to permit preparation of financial statements in conformity with [GAAP]." These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.

142. In a Form 8-K filed on or around April 2005, DHB admitted that as of December 31, 2004, there existed certain significant deficiencies in the Company's systems of inventory valuation rendering it inadequate to accurately capture cost of materials and labor components of certain work in progress and finished goods inventory. Accordingly, DHB management determined this control deficiency constituted a material weakness and therefore the Company did not maintain effective internal controls over financial reporting as of December 31, 2004. Yet the Individual Defendants caused or allowed DHB to continually represent that the weaknesses had been corrected, when they had not been.

143.    DHB's lack of adequate internal controls rendered DHB's relevant period financial reporting inherently unreliable and precluded the Company from preparing financial statements that complied with GAAP.   Nonetheless, the Company regularly issued quarterly financial statements without ever disclosing the existence of the significant and material deficiencies in its internal accounting controls and falsely asserted that its financial statements complied with GAAP.   In fact DHB continually disagreed with its outside accounting firms about the strength and procedures of the Company's internal controls, resulting in the pattern of multiple outside auditors in the last four years.

## DAMAGES TO DHB

144.    As a result of the Individual Defendants' actions, DHB has incurred massive damage including costs related to an SEC investigation, costs associated with defending class action suits and at least $60 million dollars to replace faulty body armor and to write down its worthless stockpile of Zylon®.  DHB is also now expending additional money to revaluate the accounting of inventories and the accounting for the charge related to the Zylon® recall.  Indeed, DHB has announced that it may have to restate its financial results for some or all periods of 2005.  The company also faces the possibility of losing its lucrative government contracts as the U.S. military is seeking to replace the flawed Interceptor vests.  Further, the Company has been pilfered by Brooks and his cohorts to the tune of over $93 million in self-dealing, related party transactions in 2004 alone (this number is likely to be much higher as the full extent of the Individual Defendants self dealing is revealed).  DHB's market capitalization has also been damaged by over $720 million.  At the same time that the defendants were causing DHB to suffer such damages and devastation to its market capitalization, the Insider Selling Defendants fared much better by selling over $227 million of their personally held stock.  The sheer dollar size of the self dealing and insider selling is particularly staggering given that

DHB's current market capitalization is only $212 million and DHB revenues for FY:04 were less than

$341 million and DHB's net income was less than $31 million.

## ILLEGAL INSIDER SELLING

145.    While in possession of the undisclosed material adverse information, the Insider

Selling Defendants sold the following shares of DHB stock:

| Name | Date | Shares | Price | | Proceeds | |
|------|------|--------|-------|--|----------|--|
| David H. Brooks | 12/29/2004 | 1,916,914 | $ | 19.10 | $ | 36,613,057.40 |
| | 12/28/2004 | 858,267 | $ | 19.88 | $ | 17,062,347.96 |
| | 12/27/2004 | 2,538,744 | $ | 20.94 | $ | 53,161,299.36 |
| | 12/23/2004 | 84,100 | $ | 20.06 | $ | 1,687,046.00 |
| | 12/22/2004 | 400,000 | $ | 18.60 | $ | 7,440,000.00 |
| | 11/29/2004 | 3,700,000 | $ | 18.90 | $ | 69,930,000.00 |
| | 12/11/2003 | 1,381,254 | $ | 6.25 | $ | 8,632,837.50 |
| | 11/14/2003 | 2,471,657 | $ | 7.30 | $ | 18,043,096.10 |
| | | **13,350,936** | | | **$** | **212,569,684.32** |
| Dawn M. Schlegel | 11/29/2004 | 149,503 | $ | 19.61 | $ | 2,931,753.83 |
| | | **149,503** | | | **$** | **2,931,753.83** |
| Jerome Krantz | 11/30/2004 | 31,050 | $ | 18.72 | $ | 581,256.00 |
| | 11/29/2004 | 85,176 | $ | 19.61 | $ | 1,670,301.36 |
| | | **116,226** | | | **$** | **2,251,557.36** |
| Gary Nadelman | 11/29/2004 | 102,374 | $ | 19.61 | $ | 2,007,554.14 |
| | | **102,374** | | | **$** | **2,007,554.14** |
| Cary Chasin | 11/30/2004 | 62,000 | $ | 18.57 | $ | 1,151,340.00 |
| | 11/29/2004 | 46,496 | $ | 19.61 | $ | 911,786.56 |
| | | **108,496** | | | **$** | **2,063,126.56** |
| Barry Berkman | 11/30/2004 | 12,500 | $ | 18.79 | $ | 234,875.00 |
| | 11/29/2004 | 32120 | $ | 19.61 | $ | 629,873.20 |
| | | **44,620** | | | **$** | **864,748.20** |
| Sandra Hatfield | 12/29/2004 | 65,000 | $ | 19.65 | $ | 1,277,250.00 |
| | 12/28/2004 | 24,426 | $ | 19.76 | $ | 482,657.76 |
| | 11/29/2004 | 180,119 | $ | 19.61 | $ | 3,532,133.59 |
| | | **269,545** | | | **$** | **5,292,041.35** |
| **Total** | | **14,141,700** | | | **$** | **227,980,465.76** |

146.    The following graph visually represents the timing of approximately 70% of defendant Brooks' insider sales and 100% of the other Insider Selling Defendants stock sales.



*(Not represented in the graph above are defendant Brooks' stock sales on 11/14/03 and 12/11/03)*

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

147.    Plaintiff brings this action derivatively in the right and for the benefit of DHB to redress injuries suffered, and to be suffered, by DHB as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  DHB is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

148.    Plaintiff will adequately and fairly represent the interests of DHB in enforcing and prosecuting its rights.

149.    Plaintiff is and was owners of the stock of DHB during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

150.    The Board of DHB at the time the original complaint was filed consisted of the following seven individuals: defendants Brooks, Krantz, Schlegel, Nadelman, Chasin, Berkman and Ellis.  Plaintiff has not made any demand on that Board of DHB to institute this action because such a demand would have been a futile, wasteful and useless act, particularly for the following reasons:

(a)    As a result of their access to and review of internal corporate documents, conversations and connections with other corporate officers, employees and directors, and attendance at management and Board meetings, each of the defendants knew the adverse, non-public information regarding the Company's true financial condition and business prospects, including the durability and quality of products containing Zylon® and that DHB's interceptor vest repeatedly failed to meet government contract requirements for quality.  While in possession of this material adverse, non-public information regarding the Company, the following members of the DHB Board participated in the illegal insider selling:

(i)    During the relevant period, Brooks sold 13,350,936 shares of DHB stock for proceeds of $212,569,684.32.  Defendant Brooks sold over 56% of his shares in a four week span beginning on November 29, 2004.  Also, in taking into account all of Brooks' stock sales since 1998, over **70% of those sales were completed between November 29, 2004 and December 29, 2004**, just weeks before DHB stock began to slide from an all time high of over $20 a share to the present value of just under $3;

(ii)    During the relevant period, Chasin sold 108,496 shares of DHB stock for proceeds of $2,063,126.56.  Defendant Chasin sold over 68% of his shares, **compared to never having sold any Company stock dating back to his addition as a director with DHB in 2002**.  Also,

in taking into account all of Chasin's stock sales, 100% of those sales were completed on November 29, 2004 and November 30, 2004, just weeks before DHB stock began to slide from an all time high of over $20 a share to the present value of just under $3;

(iii)    During the relevant period, Schlegel sold 149,503 shares of DHB stock for proceeds of $2,931,753.83.  Defendant Schlegel sold over 65% of her shares *compared to never having sold any Company stock dating back to her addition as a director with DHB in 2000*.  Also, in taking into account all of Schlegel's stock sales, 100% of those sales were completed on November 29, 2004, just weeks before DHB stock began to slide from an all time high of over $20 a share to the present value of just under $3;

(iv)    During the relevant period, Krantz sold 116,226 shares of DHB stock for proceeds of $2,251,557.36.  Defendant Krantz sold over 64% of his shares *compared to never having sold any Company stock dating back to his addition as a director with DHB in 2000*.  Also, in taking into account all of Krantz's stock sales, 100% of those sales were completed on November 29, 2004 and November 30, 2004, just weeks before DHB stock began to slide from an all time high of over $20 a share to the present value of just under $3;

(v)    During the relevant period, Nadelman sold 102,374 shares of DHB stock for proceeds of $2,007,554.14.  Defendant Nadelman sold over 45% of his shares, *compared to never having sold any Company stock dating back to his addition as a director with DHB in 2001*.  Also, in taking into account all of Nadelman's stock sales, 100% of those sales were completed on November 29, 2004, just weeks before DHB stock began to slide from an all time high of over $20 a share to the present value of just under $3;

(vi)    During the relevant period, Berkman sold 44,620 shares of DHB stock for proceeds of $864,748.20.  Defendant Berkman sold over 19% of his shares, *compared to never*

*having sold any Company stock dating back to his addition as a director with DHB in 2003*.  Also, in taking into account all of Berkman's stock sales, 100% of those sales were completed between November 29, 2004 and November 30, 2004, just weeks before DHB stock began to slide from an all time high of over $20 a share to the present value of just under $3;

(vii)    After communications from Toyobo dating back to 1998 warning of the possible problems associated with the durability and degradation of Zylon® and the noted failure to meet military contract expectations throughout 2004, the Individual Defendants knew or should have known that DHB's products contained significant deficiencies.  These defendants all sold their shares in the same period, November 29, 2004 through December 29, 2005, when the Company's stock was trading at its all-time maximum high in the range of $18.60 to $20.56.  Moreover, *these sales were made in the wake of the highly favorable November 9, 2004 earnings press release in which it was announced that DHB had raised its guidance for the Company's FY:04 earnings. These defendants coordinated sales, timing (most of them a day before and/or shortly after Hatfield's Waiver) and inconsistency with prior trading history strongly infer that defendants Brooks, Krantz, Nadelman, Chasin, Schlegel and Berkman sold their respective shares while in possession of material non-public information concerning DHB's condition and business prospects.  These sales were not over an expanded period of time.  Rather, every director at the time and defendant Hatfield sold their stock during a two day period in November and then defendants Hatfield and Brooks sold again over a one week period in the following December. The November sales followed shortly after the announcement of a large new order and contemporaneously with defendant Hatfield's Waiver acknowledging DHB's Interceptor vest did not meet the Marines government contract specifications.  Defendants Hatfield's and Brooks' December sales followed shortly after the November waiver and were contemporaneous with the*

*announcement of the largest contract in body armor history. Clearly, there can be no doubt that the Insider Selling Defendants stock trades are suspicious as they are dramatically out of line with their prior trading practices and at times calculated to maximize their personal benefit from undisclosed inside information.* Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested. Also, these defendants face a substantial threat of liability for breach of their fiduciary duties for insider selling. Since these directors have breached their fiduciary duties and are interested, any demand upon them would have been futile; and

(viii)   In addition, defendant Brooks has a history of illegal insider transactions. In 1992, defendant Brooks and his brother, Jeffrey Brooks, were implicated by the SEC in an insider trading scheme as well as aiding and abetting reporting violations at Jeffrey Brooks Securities, Inc. – over which defendant Brooks exerted *de facto* control. Defendant Brooks and his brother later settled the litigation by accepting a civil fine of $405,000 and consenting to a bar on involvement in any broker-dealer activities for a period of five years. In 1995, the National Association of Securities Dealers ("NASD") denied an application by DHB Capital Group, Inc. to include the company's securities on the Nasdaq SmallCap Market, in part because of the SEC's prior enforcement action against Brooks and because the NASD was "troubled by Brooks' prior misconduct." Because defendant Brooks has a history of schemes involving insider trading and received a personal financial benefit from the challenged insider trading transactions detailed herein, he is interested. Also, defendant Brooks faces a substantial threat of liability for breach of their fiduciary duties for massive insider selling. Since defendant Brooks has breached his fiduciary duties and is interested, any demand upon him would have been futile;

(b)      Defendant Brooks engaged in classic self dealing in that he stood on both sides of many of the transactions challenged by plaintiff.  As defendant Brooks stands on both sides of the transactions, he is interested in the challenged transactions and demand therefore would have been futile;

(c)      By virtue of defendant Brooks' complete domination and control over DHB, demand upon Director Defendants would have been futile. Defendant Brooks, as an officer and director of DHB, not only participated in, but precipitated the wrongful acts against DHB. Defendant Brooks runs DHB as his own personal fiefdom,[4] moving DHB around as a pawn to his and his family's benefit without consideration of the shareholders or the Company who he owes a fiduciary duty to. The extent of his domination and control is evinced through all the monetary agreements that defendant Brooks causes DHB to enter into with himself, Terry Brooks (his wife) and the various entities controlled by defendant Brooks and his family.  These agreements greatly benefit the Brooks family, but provide no benefit to DHB, and in fact, cost DHB millions of dollars.  Some examples of defendant Brooks' treatment of DHB as his family's personal sinking fund and his control of DHB's board are:

(i)      In February of 1998, immediately following a very generous compensation package to defendant Brooks in 1997, he loaned the money back to DHB at a 12% interest rate for the purchase of Lanxide Armor Products ("LAP"). DHB executed the loan, even though at that time the Federal Reserve Interest Rate for bank loans was at 8.5%;

(ii)      By October 1999, however, DHB announced its plan to "divest its 'Lanxide subsidiaries.'  This plan included the shut down of the LAP plant..."  This decision came

---

[4]  DHB are the initials of defendant Brooks.

just months after DHB publicly commented on the advantages LAP brought to the Company. Soon thereafter, LAP's equipment and machinery were moved to DHB's Jacksboro, Tennessee facility. DHB abandoned LAP only to create a capital-generating opportunity for the Brooks family;

(iii)    Terry Brooks then founded TAP in April 2000 to manufacture the same products of LAP (plates and shields for body armor). TAP's sole operations facility is within DHB's Jacksboro, Tennessee facility, which is the same location where the equipment of LAP owned by DHB was transferred to. TAP uses LAP equipment to manufacture goods to sell to DHB for profit;

(iv)    In 2004, DHB sold the main component in making SAPIs, untreated ceramic cores, to TAP for the cost price of $6.6 million and then purchased SAPIs manufactured by TAP for $17.6 million. TAP's profit went straight into the pockets of defendant Brooks and his family. In fact, DHB has paid out to TAP as much as 13% of DHB's total revenue;

(v)    From 1995 until June 2004, DHB's Point Blank subsidiary leased its office and manufacturing space from a company controlled and owned by the Brooks' family, V.A.E. Enterprises LLC ("VAE"). DHB paid total base rent under the lease to VAE in excess of $1.2 million in 2002 and 2003;

(vi)    DHB's Compensation Committee approved a business expense amounting to the "fair rental value payment of $25,000 per month [**$300,000 per year**] for the cost of renting Mr. Brooks' Florida residence."  Defendant Brooks' residence in question is a 4,947 sq. ft. beachfront condominium located within the Boca Raton Resort and Club.  DHB disclosed that it made payments to defendant Brooks' "affiliate," but that "affiliate" is Vianel Industries, Inc., a company controlled by Jeffery Brooks;

- 82 -

(vii)    Defendant Brooks is reimbursed by DHB for his "expenses" when he travels for business on a corporate jet owned by his children. Under this arrangement, the Compensation Committee determines the price of an equivalent charter flight and pays such rate to an entity controlled by the Brooks family. In 2004, DHB paid $696,000 to "non-affiliated third-party vendors for pilot pay, fuel, and plane maintenance" for business travel, and paid $161,000 to the Brooks family as compensation for mere use of the plane.  In total, defendant Brooks and his family received more than $850,000 in 2004 alone from DHB to pay for what is in effect his personal property;

(viii)   In 2004, DHB's proxy statement discloses that defendant Brooks received $87,500 in compensation for "foregone vacation";

(ix)    DHB's Board does not demand *quid pro quo* on reimbursement from defendant Brooks to DHB. Defendant Brooks charged $322,000 of personal expenses and $2 million in personal expenses to DHB credit cards in 2003 and 2004, respectively. Defendant Brooks never reimbursed DHB for these expenses, instead, the dominated directors concluded the expenses were a wash since **DHB had not reimbursed defendant Brooks adequately**;

(x)    In 2004, defendant Brooks caused DHB to approve his total compensation of $2,762,500 in salary and other compensation, and 50,000 options to purchase DHB stock.  This salary, in addition to the money defendant Brooks never reimbursed, bonuses, and other compensation and the $73.3 million gain in exercised options, discussed *infra*, amounted to **the Brooks family receiving $98 million in 2004 in direct**, **indirect and other compensation and payments**. **Whereas**, **DHB's total "record" net income in 2004 was only $30.44 million**;

(xi)    Under a 1996 employment agreement approved by the board's compensation committee, defendant Brooks was entitled to annual bonuses equal to 10 percent of

DHB's profits each year which was replaced in 1997 by a new plan granting him annual reimbursement for business and personal expenses up to 10 percent of DHB's profits;

(xii)    Following defendant Brooks' huge stock sales in late 2004, defendant Brooks used his control of DHB and the directors to receive warrants to purchase millions of shares of DHB stock at $1 per share;

(xiii)    Defendant Brooks protects his ability to dominate and control DHB's Board by allowing the directors to utilize what he believes is his personal "piggybank" from time to time.   Defendant Brooks rewards the controlled directors with excessive compensation, thus ensuring no mutiny will happen among the directors; and

(xiv)    In 2004, the Director Defendants each received 50,000 warrants to buy DHB stock at $5 per share. At this time, DHB stock was trading at $20 per share. This excessive compensation of $750,000 per director is the equivalent of Brooks paying with DHB's own money to guarantee a rubber stamp on anything he demanded from DHB or blissful ignorance to any damage he inflicted on DHB.

(d)    The Compensation Committee of the Board reviews and determines salaries, performance-based incentives and other matters relating to executive compensation, and administers the Company's equity compensation plan, including reviewing and granting stock options to executive officers:

(i)    The principal professional occupation of defendant Brooks is his employment with DHB, pursuant to which he received and continues to receive substantial monetary compensations and other benefits.  Specifically, for FY:04, DHB paid defendant Brooks *$2,762,500* in salary and other compensation, and granted him *50,000* options to purchase DHB stock. Moreover, the Compensation Committee allowed defendant Brooks to receive, in addition to his

sizable salary, over ***$2,000,000 in other compensation during 2004***.  Subsequent to June 30, 2005, ***defendant Brooks was granted options to purchase 5,250,000 commons shares pursuant to the terms of his 2000 employment agreement***, ***with an exercise price of $1.00 per share vesting 1,500,000 immediately and 750,000 on each anniversary until 2010***. ***The value of the warrants that vested immediately was approximately $11,295,000 which will be included as a non-cash compensation expense during Q3:05***. These decisions were made when the Compensation Committee, along with the remainder of the Board, knew or should have known that the Company's shares were artificially inflated as a result of the omissions from the Company's public statements of information regarding the effectiveness and durability of DHB's body armor products.   The Compensation Committee has consciously disregarded its fiduciary duty owed to DHB by allowing defendant Brooks to literally loot the Company.  Accordingly, defendants Krantz, Nadelman and Chasin as members of the Compensation Committee are interested as they each face a substantial likelihood of liability for breach of their fiduciary duties owed to DHB.  These defendants are interested and any demand upon them would have been futile;

(ii)   The principal professional occupation of defendant Schlegel is her employment with DHB, pursuant to which she received and continues to receive substantial monetary compensations and other benefits.  Specifically, for FY:04, DHB paid defendant Schlegel $700,000 in salary and other compensation, and granted her 50,000 options to purchase DHB stock. Accordingly, defendant Schlegel lacks independence from defendants Brooks, Krantz, Nadelman and Chasin, defendants who are not disinterested and/or independent and who exert influence over defendant Schlegel's compensation by virtue of their position as Chairman of the Board/CEO and members of the Compensation Committee.  This lack of independence renders defendant Schlegel incapable of impartially considering a demand to commence and vigorously prosecute this action;

(iii)	The principal professional occupation of defendant Ellis is his employment with DHB, pursuant to which he received and continues to receive substantial monetary compensations and other benefits.  Accordingly, defendant Ellis lacks independence from defendants Brooks, Krantz, Nadelman and Chasin, defendants who are not disinterested and/or independent and who exert influence over defendant Ellis' compensation by virtue of their position as Chairman of the Board/CEO and members of the Compensation Committee.  This lack of independence renders defendant Ellis incapable of impartially considering a demand to commence and vigorously prosecute this action;

(e)	During FY:04, the Board made the decision to grant each of its members, including the members who were also executive officers, 50,000 five-year common stock warrants which were exercisable at $5.88 per share.  DHB stock traded in the low 20's during 2004 giving the warrants a value of $750,000 for each director at the time.  The Board decided to grant these shares to its members when the directors knew or should have known the material non public information, alleged herein, that was omitted from the Company's relevant period statements.  Accordingly, defendants Brooks, Schlegel, Krantz, Nadelman, Chasin, Berkman and Ellis who were members of the Board during FY:04 are interested by their self dealing.  Demand upon these defendants would have been futile;

(f)	According to DHB's 10-K filed with the SEC on or about March 17, 2005, defendants Krantz, Nadelman and Chasin were members of the Audit Committee.  Furthermore, as detailed in the 2002 Company Proxy Statement, the Audit Committee's primary duties and responsibilities include monitoring the integrity of the Company's financial reporting process and systems of internal controls.  Nonetheless, the Audit Committee has had multiple disagreements with accounting firms in recent years regarding their internal controls and procedures.  Rather than fix

these issues, the Audit Committee has caused or allowed Company projections and reported results that were based upon defective presumptions and/or manipulated facts.  In fact DHB's independent certified public accountants, Grant Thornton, quit in 2003 because of the failure of DHB's Audit Committee's failure to properly disclose the large related-party transactions with Brooks, continuing a pattern of auditor resignations at DHB and leaving the Company in the position of having had *three* outside accounting firms in three years.  Again, on the Company's 10-K/A filed on May 2, 2005, the attestation report of Weiser identified what the Company's latest accounting firm considered were two material weaknesses in internal controls and procedures: (i) failure of the Company to complete consultation with Weiser prior to filing Form 10-K for the year ended December 31, 2004; and (ii) a need to enhance and strengthen the Audit Committee to improve the Committee's effectiveness.  On April 8, 2005, DHB was notified that *Weiser had declined to stand for re-election as the Company's principal independent accountants*.  Weiser had served as the Company's principal independent accountants since August 27, 2003.  By such actions, defendants Krantz, Nadelman and Chasin breached their duties by allowing the Company's problems with internal controls and procedures to remain unabated over an extended period of time despite numerous red flags including direct contact from their auditors indicating that the Company's internal controls were not adequate.  As a result of these defendants' breach of their duties, any demand upon them would have been futile;

(g)    The Board is responsible for making sound and proper decisions concerning DHB.  The Board caused or allowed the Company to issue public statements that excessively touted DHB's business prospects and the quality of its body armor products.  These decisions to allow the Company to issue these statements were made when the Board had full knowledge of the problems regarding the effectiveness and durability of body armor manufactured by the Company which

contained Zylon® and the repeated failure of DHB's Interceptor vests to meet the standards mandated by its contract with the U.S. military. The Board allowed these defective vests to be sold to the U.S. military and law enforcement agencies, directly having knowledge of the deficiencies in Zylon® through communications from Toyobo and the repeated failure of U.S. military ballistic tests. In addition, on January 2, 2005, a class action that was filed against the Company alleging concerns regarding the effectiveness and durability of body armor with high concentrations of Zylon®. However, rather than fully investigate the matter, the Board pushed for a quick settlement which was announced a mere month later in February 2005. These repeated failures to exercise reasonable business judgment are inexcusable. Accordingly, defendants Brooks, Schlegel, Krantz, Nadelman, Chasin, Berkman and Ellis, as directors of DHB when these grossly negligent Board decisions were made, each face a substantial likelihood of liability for breach of their fiduciary duties owed to DHB. Accordingly, these defendants are interested and any demand upon them would have been futile;

(h)     The entire DHB Board and senior management participated in the wrongs complained of herein. DHB's directors are not disinterested or independent due to the following: defendants Brooks, Schlegel, Krantz, Nadelman, Chasin, Berkman and Ellis served on the DHB Board during the relevant period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the above referenced defendants breached the fiduciary duties that they owed to DHB and its shareholders in that they failed to prevent and correct the improper statements. Thus, the DHB Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is

their actions that have subjected DHB to millions of dollars in liability for possible violations of applicable securities laws;

(i)     Any suit by the directors of DHB to remedy these wrongs would likely expose the Individual Defendants and DHB to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(j)     DHB has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for DHB any part of the damages DHB suffered and will suffer thereby;

(k)     If the directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them (except defendant Ellis) contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants.  In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions.  This they will not do. Thus, demand would have been futile; and

(l)     If DHB's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of DHB.  However, due to certain changes in the language of directors' and officers' liability insurance

policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by DHB against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of DHB, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the directors will not cause DHB to sue them, since they will face a large uninsured liability.

151. Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for DHB for any of the wrongdoing alleged by plaintiff herein.

152. Plaintiff did not make any demand on shareholders of DHB to institute this action since such demand would have been a futile and useless act for the following reasons:

(a) DHB is a publicly held company with over 45 million shares outstanding, and thousands of shareholders;

(b) Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c) Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Insider Selling Defendants for Breach of Fiduciary
### Duties for Insider Selling and Misappropriation of Information

153.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

154.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold DHB common stock on the basis of such information.

155.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold DHB common stock.

156.    At the time of their stock sales, the Insider Selling Defendants knew, among other things, that the Company's body armor products were materially defective based on numerous sources of information and of the Hatfield Waiver signed contemporaneously with the Insider Selling Defendants' sales.  The Insider Selling Defendants' sales of DHB common stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

157.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

158.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

- 91 -

159. The Individual Defendants owed and owe DHB fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe DHB the highest obligation of good faith, fair dealing, loyalty and due care.

160. The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

161. Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company and failed to correct the Company's publicly reported financial guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

162. Brooks and the other Individual Defendants engaged in self dealing in order to enrich themselves at the expense of DHB. This self-dealing was a violation of defendants' duty of loyalty and good faith.

163. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, DHB has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

164. Plaintiff on behalf of DHB has no adequate remedy at law.

### COUNT III

### Against the Individual Defendants for Abuse of Control

165. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

166. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence DHB, for which they are legally responsible.

167.    As a direct and proximate result of the Individual Defendants' abuse of control, DHB has sustained significant damages.

168.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

169.    Plaintiff on behalf of DHB has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Gross Mismanagement

170.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

171.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of DHB in a manner consistent with the operations of a publicly held corporation.

172.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, DHB has sustained significant damages in excess of hundreds of millions of dollars.

173.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

174.    Plaintiff on behalf of DHB has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Waste of Corporate Assets

175.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

176.    As a result of the improper statements issued during the Relevant Period, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused DHB to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

177.    The related party transactions with Brooks and the Brooks entities controlled by his family had no corporate purpose and were entered into solely to divert money from DHB to defendant Brooks.

178.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

179.    Plaintiff on behalf of DHB has no adequate remedy at law.

## COUNT VI

### Against All Defendants for Unjust Enrichment

180.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

181.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of DHB.

182.    Plaintiff, as a shareholder and representative of DHB, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT VII

### Against All Defendants for Aiding and Abetting Breaches of Fiduciary Duty

183.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

184.    As described above, each of the defendants aided and abetted on or more of the other defendants in breaching fiduciary duties owed to DHB, as alleged herein.

185.    As a direct and proximate result of the defendants' aiding and abetting breaches of fiduciary duty, DHB engaged in imprudent and unlawful activities which have caused DHB to suffer damages, as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of DHB has an effective remedy;

C.    Awarding to DHB restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

D.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  March 20, 2006

LAW OFFICES OF THOMAS G. AMON
THOMAS G. AMON

_____

THOMAS G. AMON (TGA1515)

500 Fifth Avenue, Suite 1650
New York, NY 10110
Telephone: 212/810-2430
Facsimile:  212/810-2427

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
JEFFREY P. FINK
STEVEN R. WEDEKING II
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile: 619/525-3991

Attorneys for Plaintiff

H:\DHB\Complaints\Derivative\Consolidated Complaint\Consolidated Complaintv3.doc

<u>VERIFICATION</u>

I, ALVIN VIRAY, have read the DHB Industries, Inc. Verified Consolidated Shareholder Derivative Complaint and know the contents thereof.  The Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:_____3/20/06_____

_____
ALVIN VIRAY