**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

**IN RE: DHB INDUSTRIES, INC.**

**THIS DOCUMENT RELATES TO ALL ACTIONS**

**CV-2:05-04296**
**(CLASS ACTION)**

**CV-2:05-04345 (JS) (ETB)**
**(DERIVATIVE ACTION)**

**OBJECTIONS TO**
**DERIVATIVE SETTLEMENT**

------------------------------------------------------------X

     D. David Cohen, an attorney at law duly admitted to practice, before the Courts of the

State of New York, and this Court, a stockholder of DHB Industries, Inc. ("DHB" or the

"Company") and a member of the putative Class, as defined in the Proposed Class Settlement,

herein objects to the Derivative Settlement.

1.    I own 45,100 Shares of DHB Common Stock.  On November 30, 2006, I owned 29,100

Shares of DHB Common Stock. All of those Shares were acquired during the Class Period, 500

via Open Market Purchase in April of 2005, and the balance through settlement of a prior

dispute.  I am qualified to object to the Derivative Settlement.  The Derivative Settlement has

been combined with a Class Settlement in a companion case <u>and</u> with certain financial

transactions between the Company and one of the Individual Defendants (not presented to the

Court for approval, but which will effectively "be approved" <u>if</u> the Settlement, with the final

Class periods[1] sought by the parties, is approved).

2.    My continuing objection to the Derivative Settlement is based upon (i) factual claims as

to the original "wrongs" against the Company; (ii) factual claims as to further and additional

---

[1] The proponents of Settlement have extended the Class Period from August 30, 2005 to November 30, 2006 (15 months) without any demonstrable purpose.  This also moves the Derivative Claim to November 30, 2006, which has the effect, if not the intent, to provide <u>cover</u> for the various misdeeds that the Individual Defendants committed against the Company during the pendency of the litigation.

"wrongs" against the Company, which have been perpetuated during the pendency of this litigation; and (iii) the failure of the Settling Parties to demonstrate that the Settlement is fair and reasonable from the perspective of DHB, the publicly-owned Company, its public shareholders at the time that the Derivative Action was instituted or its public shareholders as of August 30, 2005 or November 30, 2006. Derivative claims were made on behalf of the Company against the Individual Defendants. Yet, the Derivative Settlement fails to address any of that alleged wrongdoing. The Derivative Plaintiff has, instead, yielded entirely to the interests of the Class Counsel and the Individual Defendants. Meanwhile, Class Counsel, in exchange for a proposed multi-million dollar fee to themselves, agreed that the entire burden of the approximately $50,000,000 Settlement for the Class would be borne by DHB, the publicly-owned Company and the principal victim of the wrongdoing in the case.

3.      The Individual Defendants in the DHB Derivative Action, and in the companion Class Action are David H. Brooks ("Brooks"), Sandra Hatfield, Dawn M. Schlegel, Jerome Krantz, Cary Chasin, and Barry Berkman (Hatfield, Schlegel, Krantz, Chasin and Berkman are sometimes herein referred to as the "Brooks Group"), Terry Brooks ("Mrs. Brooks"), Tactical Armor Products, Inc. ("TAP"), a DHB supplier wholly-owned by Mrs. Brooks, and various Brooks companies and Brooks family members and family entities ("Brooks Family").

4.      On September 11, 2001, DHB was little known, but a leading and fast growing manufacturer and supplier of body armor for the U.S. Military and police agencies throughout the United States. When on September 11, 2001, the twin towers of New York's World Trade Center and the Pentagon were attacked by suicide bombers, and those events subsequently lead to the onset of the conflicts in Afghanistan and Iraq which followed, DHB and Brooks quite suddenly had an opportunity to fulfill national needs of utmost importance, while at the same

time rewarding the DHB public shareholders for investing in the thinly traded entity. Instead of fulfilling those roles honorably, Brooks, the Brooks Group, and the Brooks Family Defendants engaged, according to the Class and Derivative Complaints, in a "pump and dump" scheme by falsifying DHB's financial information, failing to disclose or deal honestly with products quality issues that the Army and the Marines had uncovered in 2004, and by using an inferior textile they knew, or should have known to be defective, for body armor supplies to domestic police agencies. Then, in the last thirty three days of December, 2004, while there was admittedly unreliable financial information outstanding, all officers and directors acting together engaged in a coordinated Cashless Warrant Raid on the Company pursuant to which they together sold 10,276,279 Shares to the public in <u>unregistered</u> Share transactions and netted more than $201,078,715 to themselves. Brooks alone sold 9,498,025 Shares for $185,903,322, see Schedule C "Proceeds of Sales of DHB Shares by Affiliated Individuals from November 29, 2004 to December 30, 2004, annexed hereto as Exhibit A hereof. But, the 2004 Cashless Warrant Raid on the Company by the Individual Defendants was neither the whole, <u>nor</u> the end of, the very, very unhappy truthful tale of corporate perfidy.

5.      The events of September 11th, and the continuing conflicts in Afghanistan and Iraq in which America has been engaged, created opportunities for many to have been good and faithful citizens. Brooks, the Brooks Group, and the Brooks Family are the anti heroes. The best evidence indicates that they have together been villains in the worse sense of the word, despicably using the national emergency to line their own pockets, at great cost to the nation, and at substantial risk to the soldiers in the field defending the nation, while not coincidentally fleecing America's small stockholders who honestly, some even patriotically, jumped on the bandwagon of DHB's stock. Brooks has been described as a "War Profiteer" by many, including,

3

Sara Anderson, a fellow for the Institute of Policy Studies, in Washington D.C. (See article dated July 13, 2006 "The Rise and Fall of a War Profiteer," annexed hereto as Exhibit B hereto). The label may be proportionately applicable to the other Individual Defendants, each of whom abused the publicly-owned entity they served as fiduciaries, while making instant millions for their risk free Cashless Warrant Shares.

6.      The Individual Defendants abusive conduct was accompanied by, and achieved with, manipulative accounting and certified financial statements that are admittedly unreliable, and were likely false and fraudulent when filed.   Two of the Individual Defendants have been indicted, and yet to be tried. Brooks has left the United States, where he is, or may be, a fugitive from justice. The Company's "unreliable" financial statements from 2003 and 2004 have yet to be corrected. No financial statements have been published for the last quarter of 2005, for the full year of 2005, for the full year of 2006 or for any of the fiscal quarters in 2006 or 2007 to date, thus leaving four and three-quarter years as fiscally "unknown".  The settling parties ask this Court to blindly approve a Derivative Action Settlement which is notable only for provisions that penalize the victim, DHB, and which provide protections, indemnifications and waivers, including waivers of rights under Sarbanes-Oxley, for Brooks and the other Individual Defendants in a manner completely irreconcilable with the need for truth, honesty, and decency in litigation. The Settlement fails to meet the established standards for approval and should be rejected by this Court for the following detailed reasons:

A.      Although DHB, the publicly-owned Company and Derivative Plaintiff was gravely damaged and nearly bankrupted by the series of events alleged in the Derivative Complaint, and the related Class Action, it is the publicly owned Company, rather than Brooks or any of the wrongdoers, which is being required to pay for the simultaneous Class Action

Settlement of $34,900,000 plus 3,400,000 Shares to the Class.  Representations previously made to this Court and others that Brooks was "contributing" $20,000,000 or $22,000,000 of the Class Settlement Amount" were false when made and remain completely false.  But even if the Share purchases included some implicit modicum of contribution by Brooks, that in no way justifies saddling DHB with the whole of the Settlement obligation.  That is wrong and impermissible under the express terms of the Private Securities Litigation Reform Act of 1995 ("PSLRA") (f)(2)(B), (f)(3).

B.   Although Derivative Plaintiff asserted that DHB was looted and defrauded, DHB is collecting nothing (zero) from the Individual Defendants charged with such alleged looting and other alleged wrongdoing.  Meanwhile, the Company has failed to disclose the results of the Company paid special accounting examination into the extent of the looting that took place. Derivative Counsel did not require it for purposes of this Settlement, and from all that appears in the record did not even seek to examine those accounting records.  Thus, a great deal of suspected looting by Brooks and additional wrongdoing by other Individual Defendants is unknown, and not even pled to the extent it occurred after August 30, 2005.  If this Settlement with the extended date of November 30, 2006 is approved, all of those wrongs and unpled matters will be whitewashed without evidence, without testimony and without reason.

C.   During the period from November 29, 2004 to December 30, 2004, the Individual Defendants transferred 303,726 Shares back to the Company at inflated prices of $20.12 per Share for $6,099,178 net credits to themselves, while simultaneously selling more than Two Hundred Million ($200,000,000) Dollars of DHB Shares to the public (approximately $70,000,000 of which was "profit" generated from Warrant Shares simultaneously received for zero cash from the Company).  The Company will recover none of that money.

D.      Brooks, through individuals controlled by him, reached the Settlement with Class Counsel, principally Mr. William S. Lerach, who recently resigned from lead Class Counsel to take a guilty plea in connection with other criminal violations of the PSLRA. I have reason to believe that this Settlement was reached in principle before June 12, 2006. Each of the Individual Defendants who were directors of the Company at the time of Settlement were maintained as paid directors of the Company until an MOU of Settlement was signed, and as to a majority of such Individual Defendant directors, until the Settlement Agreement was finalized. No attempt was made to have a truly independent disinterested body participate in the Settlement negotiations or review the proposed resolution, as fiduciaries for the Company, and/or the shareholders other than the Individual Defendants.

E.      The claimed "Corporate Governance" resolution of the Derivative Action was vacuous from inception. The Settlement and an accompanying series of Side Agreements provided Defendant Brooks with rights to purchase more than 6,000,000 additional DHB Shares at highly favorable prices, and will leave Defendant Brooks as the single largest shareholder of the Company, with the ability to retain substantive voting control of the Company in the future. The Settlement also apparently leaves his wife, Defendant Terry Brooks, as the Landlord of the Company's Florida facilities without any accounting for the improper profits she generated from her insider dealings with the Company previously or any known modification of her lease agreement with the Company. Finally, the Settlement leaves Mr. & Mrs. Brooks, and all of Individual Defendants, free to remain in control of the Company's prior vendor, Tactical Armor Products, Inc., and, by implication, other, and potential future, vendors to the Company.

F.      Despite the fact that the sole consideration for Settlement were alleged Corporate Governance Principles, (i) subsequent to the MOU of Settlement being arrived at (but prior to it

being finalized or disclosed), the Company's Shares were delisted from the American Stock Exchange for non-compliance with the AMEX rules; (ii) The Company remains not in compliance with the filing requirements under the Securities Exchange Act of 1934 and provides only limited and sporadic financial information to continuing investors saying what they want, when they want, ignoring the Securities Laws reporting obligations as if this was pre-1933; (iii) The Company has not held a general meeting of Stockholders since May of 2005, and remains not in compliance with the provisions of Delaware Law requiring the annual election of directors by Stockholder's, (iv) every current director of the Company, except one, had never been elected by the Stockholders or been presented to the Stockholders for election or rejection; (v) through the use of by-law provisions and a dilutive Preferred Stock Warrant which "springs" if anyone other than Brooks acquires more than 15% of the voting Stock, they have structured the Company so that the current managers continuation in office is highly likely to be dependent on their securing the favorable vote of Brooks in the future, and (vi) the two directors who claim "credit" for the Settlement, Messrs. Ellis and Campbell have rewarded themselves with thousands of free Shares for their service to the Company.

7.     This is an inexplicable Derivative Settlement.  It can only be understood by examination of the actual facts that prevailed when the negotiations for Settlement commenced and were substantively concluded in May and early June of 2006.  At that time, Brooks completely controlled the publicly owned Company known as DHB.  At that time all of the directors, minus two, General Larry Ellis, and [former California State] Senator William Campbell (elected to the DHB Board on May 9, 2006), were the principal Individual Defendants in the Class Action, and Derivative Action, all of whom had in a coordinated fashion engaged in the Cashless Warrant Raid on the Company at the end of 2004.  At that time, Class Counsel was threatening the

7

Individual Defendants with a Motion to Freeze the $200,000,000 of proceeds that they had individually received from the sale of DHB securities in the period from November 29, 2004 to December 30, 2004. The objection to the Derivative Settlement is simple: The Individual Defendants, Class Counsel and the Derivative Counsel reached an accommodation which satisfied their own interests, but which completely sacrificed the fair and appropriate interests of, the publicly owned Company, its public shareholders as of the date the Derivative Action was instituted, and its continuing public shareholders.

\*       \*       \*       \*

8.      This is not an insoluble problem for this Court. The District Court has both the power, and in our view respectfully, the obligation to reject the Settlement in its current form, and send the parties back to the drawing board with a direction to include Objectors in the process to arrive at a mutually acceptable revised Settlement which meets the requirements of law and is fair, reasonable and in the interests of justice for all concerned, including especially the publicly-owned Company, or in the absence of such an accord, to direct the parties to prepare for a trial of the issues during which DHB would be required to have Counsel, selected by a Stockholder elected Board of Directors free of taint of control by the Individual Defendants, to represent the publicly-owned Company's Independent Interests.

9.      In addition to the foregoing, the undersigned also relies upon all prior pleadings submitted and proceedings held herein including, but not limited to, the Response and Objections dated January 12, 2007 and the Transcripts of Oral Argument held on January 19, 2007 and May 29, 2007, the undersigned's letter dated May 3, 2007 to the Attorney Generals pursuant to the

Class Action Fairness Act of 2005, together with its Tabbed Exhibits, a courtesy copy of which was previously provided to this Court and to all of the litigants herein.  In addition to the foregoing, this Objector, together with counsel, intends to file a short Memorandum of Law in Support of the Objections.

Respectfully submitted,

Dated: September 20, 2007
Jericho, New York 11753

D. David Cohen

CC:     Service List

9

*Exhibit "A"*

FINAL

SCHEDULE C

TABLE I

**PROCEEDS FROM SALES OF DHB SHARES
BY AFFILIATED INDIVIDUALS
FROM NOVEMBER 29, 2004 TO DECEMBER 30, 2004**

| | | | Sales to Company[1] | Sales in Open Market[2] |
|---|---|---|---|---|
| 11/29 | Brooks | (a) | $4,129,509 | |
| 11/29 | Brooks | (b) | | $ 69,930,000 |
| 12/22 | Brooks | (c) | | 7,439,280 |
| 12/23 | Brooks | (d) | | 1,687,382 |
| 12/27 | Brooks | (e) | | 53,173,485 |
| 12/28 | Brooks | (f) | | 17,060,116 |
| 12/29 | Brooks | (g) | | 36,613,057 |
| Brooks Total | | | | $185,903,322 |
| 11/29 | Schlegel | (h) | 563,239 | |
| 11/29 | Schlegel | (i) | | 2,931,754 |
| 11/29 | Krantz | (j) | 298,239 | |
| 11/29 | Krantz | (k) | | 1,670,301 |
| 11/30 | Krantz | (l) | | 581,256 |
| 11/29 | Chasin | (m) | 70,500 | |
| 11/29 | Chasin | (n) | | 911,590 |
| 11/30 | Chasin | (o) | | 1,151,340 |
| 11/29 | Nadelman | (p) | 329,485 | |
| 11/29 | Nadelman | (q) | | 2,007,554 |
| 11/29 | Berkman | (r) | 108,245 | |
| 11/29 | Berkman | (s) | | 629,873 |
| 11/29 | Hatfield | (t) | 400,006 | |
| 11/29 | Hatfield | (u) | | 3,532,134 |
| 12/28 | Hatfield | (v) | 199,954 | |
| 12/28 | Hatfield | (w) | | 482,575 |
| 12/29 | Hatfield | (x) | | 1,277,016 |
| | TOTAL | | $6,099,178 | $201,078,715 |

---

[1] Via exercise of Cashless Warrants.
[2] The numbers set forth herein have not been audited or reviewed, but are believed to be a reliable calculation directly from the individuals Form 4s.

According to the Form 4s filed by or on behalf of the individuals involved, the following transactions in DHB Common Stock took place from November 29th December 30, 2004:

1. David H. Brooks (Chief Executive Officer)

    (a) On November 29, 2004, Exercised Warrants to acquire 3,875,000 selling 205,244 Shares to the Company at **$20.12** per Share or $4,129,509, which he used to pay for the 3,669,756 Shares he retained for zero cash.

    (b) On November 29, 2004, Sold 3,700,000 Shares in the open market at $18.90 per Share or $69,930,000.

    (c) On December 22, 2004, Sold 400,000 Shares in the open market at $18.5982 per Share or $7,439,280.

    (d) On December 23, 2004, Sold 85,100 Shares in the open market at $20.064 per Share or $1,687,382.

    (e) On December 27, 2004, Sold 2,538,744 Shares in the open market at $20.9448 per Share or $53,173,485.

    (f) On December 28, 2004, Sold 848,267 Shares in the open market at $19.8774 per Share or $17,060,161.

    (g) On December 29, 2004, Sold 1,916,914 Shares in the open market at $19.1 per Share or $36,613,057.

2. Dawn M. Schlegel (Chief Financial Officer)

    (h) On November 29, 2004, exercised Warrants to acquire 205,000 Shares, selling 27,994 of those Shares to the Company at **$20.12** per Share or $563,239, which she used to pay for the 177,006 Shares which she retained for zero cash.

    (i) On November 29, 2004, sold 149,503 Shares in the open market at **$19.61** per Share or $2,931,754

3. Jerome Krantz (Chairman of the Audit Committee)

    (j) On November 29, 2004, exercised Warrants to acquire 100,000 Shares, selling 14,823 of those Shares to Company at **$20.12** per Share or

$298,239, which he used to pay for the 85,177 Shares which he retained for zero cash.

(k)   On November 29, 2004, sold 85,176 Shares in the open market at **$19.61** per Share or $1,670,301.

(l)   On November 30, 2004, sold 31,050 Shares in the open market at $18.72 per Share or $581,256.

Cary Chasin (Member, Audit Committee)

(m)   On November 29, 2004, exercised Warrants to acquire 50,000 Shares, selling 3,504 of those Shares to the Company at **$20.12** per Share or $70,500, which he used to pay for the 46,496 Shares, which he retained for zero cash.

(n)   On November 29, 2004, Sold 46,486 Shares in the open market at **$19.61** per Share or $911,787.

(o)   On November 30, 2004, Sold 62,000 Shares in the open market at $18.57 per Share or $1,151,340.

Gary Nadelman (Member, Audit Committee)

(p)   On November 29, 2004, exercised Warrants to acquire 100,000 Shares, selling 16,376 of those Shares to the Company at **$20.12** per Share or $329,485, which he used to pay for the 83,624 Shares, which he retained for zero cash.

(q)   On November 29, 2004, sold 102,374 Shares in the open market at **$19.61** per Share or $2,007,554.

6.   Barry Berkman, Esq. (Director)

(r)   On November 29, 2004, exercised Warrants to acquire 25,000 Shares, selling 5,380 of those Shares to the Company at **$20.12** per Share or $108,245, which he used to pay for the 19,620 Shares which he retained for zero cash.

(s)   On November 29, 2004, sold 32,120 Shares in the open market at **$19.61** per Share or $629,873.

7.   Sandra Hatfield (President of Operating Subsidiary)

(t)   On November 29, 2004, exercised Warrants to acquire 200,000 Shares, selling 19,881 Shares to the Company at **$20.12** per Share or $400,000 which she used to pay for 180,119 Shares, which she retained for zero cash.

(u)   On November 29, 2004 sold 180,119 Shares in the open market at **$19.61** per Share or $3,532,133.

(v)   On December 28, 2004, exercised Warrants to acquire 100,000 additional Shares, selling 10,574 Shares to the Company at $18.91 per Share or $200,000, which she used to pay for the 89,426 Shares, which she retained for zero cash.

(w)   On December 28, 2004, sold 24,426 Shares in the open market at $19.7566 per Share or $482,574.

(x)   On December 29, 2004, sold 65,000 Shares in the open market at $19.6464 per Share or $1,277,016.

There are numerous "amazing" "perplexing" "extraordinary" and "disturbing" facts which can readily be derived from the Schedules:

- Each and every director <u>and</u> the President of the Company's principal operating subsidiary all exercised Warrants and started their program of Shares sales on the same exact day.

- No one filed a 13(D) to reflect their group action either before or after the transactions.

- The total new Shares sold to the "public" in that one month period aggregated 10,276,279 Shares, or more than 33% of the Shares in the public float prior to the transactions. No one filed a registration statement.

- Virtually all of the Warrant Shares sold by the affiliates were sold on the same day the Shares were acquired pursuant to a claimed "private offering" exemption. No holding period was observed for the Warrant Shares.

- The Certificates for Warrant Shares acquired were not legended and appear to have been issued directly to the public with the "affiliates" as mere conduits, there to receive the money, from Share sales which everyone presumably knows could certainly not have been made by the Company directly, without registration.

- There is no known record of any lawyer or law firm rendering an opinion that the Shares or the Warrant Shares could be sold in the manner sold, without

registration, and there has been no publicly expressed compliance with the conditions of Rule 144, even <u>if</u> the Warrant Shares could qualify as meeting the holding period requirements of Rule 144 by relation back to the date of issuance of the Warrants.

- There may or may not be questions as to whether the transactions violated the letter of §16 of the Exchange Act, but there can be no doubt that they violated the spirit of §16 prohibition on Insider profiting from purchases and sales of any publicly traded class of Reporting Company securities within six (6) months.

Page 7 shows the percentage of Shares sold by each officer and director as a fraction of such person's owned Shares at the start of the November 29, 2004 to December 30, 2004 period, including <u>as</u> <u>owned</u> the Warrant Shares acquired by exercised as the Cashless Warrants. Footnote 3 shows the percentage without the Warrant Shares.

The first table on page 8 shows the Warrant Shares actually sold to the Company (at $20.12 per Share) and Warrant Shares retained for zero cash by each Individual Defendant. Then, the lower table uses $4.00 as a round number estimate of the actual per Share market value in the 90 day period following the Zylon announcement as the "proper" price for calculating the Warrant Shares which the Individual Defendants would have been able to retain and resell, had they announced the Zylon problem before the series of transactions. In that event:

(a) All directors other than Brooks would have yielded $558,750 (8%) instead of $6,999,706;

(b)  Dawn Schlegel, CFO, would have yielded $256,250 (8.7%) instead of $2,931,754;

(c)  Sandra Hatfield, President of the operating subsidiary would have yielded $600,000 (11.3%) instead of $5,291,723; and

(d)  Brooks would have yielded $11,392,800 (16.4%) instead of $69,358,388 or approximately $58,000,000 less than the amounts he took for himself.

The second schedule on p.8 relates only to the Warrant Shares taken from the Company.  In fact, if §16 of the Exchange Act applies to these transactions, one hundred percent (100%) of the directors and officers proceeds ($82,000,000) from the Warrant Shares may belong to the Company and be required to be returned to the Company.

Page 9 is a spreadsheet compilation showing purchases and sales to the Company and to the market in both dollars and share amounts in one summary.

**TABLE II**

**SHARES SOLD AS A PERCENTAGE**
**OF**
**SHARES OWNED PRIOR TO SALE**

| | Start[3] | Sold | Held | % Sold |
|---|---|---|---|---|
| Brooks | 12,853,904[4] | 9,498,025 | 3,355,879[4] | (74%) |
| Schlegel | 177,506 | 149,503 | 28,003 | (84%) |
| Krantz | 130,526 | 116,226 | 14,300 | (89%) |
| Chasin | 108,486 | 108,486 | Zero | (100%) |
| Nadelman | 174,499 | 102,374 | 72,125 | (59%) |
| Berkman | 151,820 | 32,120 | 107,200 | (21%) |
| Hatfield I | 180,119 | 180,119 | Zero | (100%) |
| Hatfield II | 89,426 | 89,426 | Zero | (100%) |

| | | | | |
|---|---|---|---|---|
| Total Start | 13,866,286 | | | |
| Total Sold | | 10,276,279 | | |
| Total Held (End of Period) | | | 3,577,507 | |
| Total % Sold | | | | 74.1%[3] |

---

[3] The start numbers <u>include</u> Shares received by such persons from the Company for zero cash upon exercise of Cashless Warrants at the start of the Share Sales:  If those 4,351,224 Shares are excluded from the start numbers, this most unusual case involves the unprecedented <u>sale</u> by all officers and directors of <u>more than 100%</u> of their owned interest in the Company within a period of thirty (30) days.

[4] Excludes 3,057,292 acquired by Mr. Brooks' spouse also upon exercise of "cashless" warrants in 2002.

TABLE III

INDIVIDUAL DEFENDANTS
WARRANT SHARES SOLD TO COMPANY

|  | Warrant | Implicit Exercise Price | Warrant Shares Sold to Company | Warrant Shares Retained for Zero Cash |
|---|---|---|---|---|
| Brooks | 3,875,000 | $1.06 | 205,244 | 3,669,756 |
| Schlegel | 205,000 | 2.75 | 27,994 | 177,006 |
| Krantz | 100,000 | 2.98 | 14,823 | 85,177 |
| Chasin | 50,000 | 1.41 | 3,504 | 46,496 |
| Nadelman | 100,000 | 3.29 | 16,376 | 83,624 |
| Berkman | 25,000 | 4.32 | 5,380 | 19,620 |
| Hatfield I | 200,000 | 2.00 | 19,881 | 180,119 |
| Hatfield II | 100,000 | 2.00 | 10,574 | 89,426 |
|  | 4,655,000 |  | 303,776 | 4,351,224 |

During the ninety days following the announcement of the Zylon write-off, DHB Shares traded in a range between $3.00 to $5.00. Using $4.00, a midpoint within that range, if the Cashless Warrants had been exercised then, the Individual Defendants would have received the following amounts of Cashless Warrant Shares (for zero cash) and dollar values:

| | Adjusted Warrant Shares | Adjusted Market Value | Actual Proceeds from Warrant Shares Received in December | Excess Dollar Amount[5] |
|---|---|---|---|---|
| Brooks | 2,848,125 | $11,392,800 | $69,358,388 | $57,965,588 |
| Schlegel | 64,062 | 256,250 | 2,931,754 | 2,675,504 |
| Krantz | 25,500 | 102,000 | 1,670,321 | 1,568,321 |
| Chasin | 32,375 | 129,500 | 911,787 | 782,287 |
| Nadelman | 17,750 | 71,000 | 1,639,867 | 1,568,867 |
| Berkman | -0- | -0- | 384,748 | 384,748 |
| Hatfield | 150,000 | 600,000 | 5,291,724 | 4,691,723 |
|  | 3,137,812 | $12,551,550 | $82,188,589 | $69,637,341 |

---

[5] Excess arising from the Individual Defendants "good fortune" of having exercised the Cashless Warrants before announcing the problem" with Zylon products and $60,000,000 write off.

Sheet1

REVISED 12:5 A.M.
SCHEDULE C
PROCEEDS FROM SALES OF DHB SHARES
BY AFFILIATED INDIVIDUALS
FROM NOVEMBER 29, 2004 TO DECEMBER 30, 2004

TABLE I

| | Date | | Purchases by Individuals | | | Sales to Company | | | Shares retained post exercise + sale at no cost | Sales to Market | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Shares | Price | Total | Shares | Price | Total amount | | Shares | Price | Total amount |
| Brooks | 29-Nov-04 | (a) | 3,875,000 | $1.0657 | $4,129,509 | 205,244 | $20.1200 | $4,129,509 | 3,669,756 | 3,700,000 | 18.9000 | $69,930,000 |
| Brooks | 29-Nov-04 | (b) | | | | | | | | 400,000 | 18.5982 | 7,439,280 |
| Brooks | 22-Dec-04 | (c) | | | | | | | | 84,100 | 20.0640 | 1,687,382 |
| Brooks | 23-Dec-04 | (d) | | | | | | | | 2,538,744 | 20.9448 | 53,173,485 |
| Brooks | 27-Dec-04 | (e) | | | | | | | | 858,267 | 19.8774 | 17,060,116 |
| Brooks | 28-Dec-04 | (f) | | | | | | | | 1,916,914 | 19.1000 | 36,613,057 |
| Brooks | 29-Dec-04 | (g) | | | | | | | | | | |
| **Brooks Total** | | | 3,875,000 | | 4,129,509 | 205,244 | | $4,129,509 | 3,669,756 | 9,498,025 | | $185,903,322 |
| Schlegel | 29-Nov-04 | (h) | 205,000 | $2.7475 | 563,239 | 27,994 | 20.1200 | $563,239 | 177,006 | 149,503 | 19.6100 | 2,931,754 |
| Schlegel | 29-Nov-04 | (i) | | | | | | | | | | |
| **Schlegel Total** | | | 205,000 | | 563,239 | 27,994 | | $563,239 | 177,006 | 149,503 | | $2,931,754 |
| Krantz | 29-Nov-04 | (j) | 100,000 | $2.9824 | 298,239 | 14,823 | 20.1200 | $298,239 | 85,177 | 85,176 | 19.6100 | 1,670,301 |
| Krantz | 29-Nov-04 | (k) | | | | | | | | 31,050 | 18.7200 | 581,256 |
| Krantz | 30-Nov-04 | (l) | | | | | | | | | | |
| **Krantz Total** | | | 100,000 | | 298,239 | 14,823 | | $298,239 | 85,177 | 116,226 | | $2,251,557 |
| Chasin | 29-Nov-04 | (m) | 50,000 | $1.4100 | 70,500 | 3,504 | 20.1200 | $70,500 | 46,496 | 46,486 | 19.6100 | 911,590 |
| Chasin | 29-Nov-04 | (n) | | | | | | | | 62,000 | 18.5700 | 1,151,340 |
| Chasin | 30-Nov-04 | (o) | | | | | | | | | | |
| **Chasin Total** | | | 50,000 | | 70,500 | 3,504 | | $70,500 | 46,496 | 108,486 | | $2,062,930 |
| Nadelman | 29-Nov-04 | (p) | 100,000 | $3.2949 | 329,485 | 16,376 | 20.1200 | $329,485 | 83,624 | 102,374 | 19.6100 | 2,007,554 |
| Nadelman | 29-Nov-04 | (q) | | | | | | | | | | |
| **Nadelman Total** | | | 100,000 | | 329,485 | 16,376 | | $329,485 | 83,624 | 102,374 | | $2,007,554 |
| Berkman | 29-Nov-04 | (r) | 25,000 | $4.3298 | 108,245 | 5,380 | 20.1200 | $108,245 | 19,620 | 32,120 | 19.6100 | 629,873 |
| Berkman | 29-Nov-04 | (s) | | | | | | | | | | |
| **Berkman Total** | | | 25,000 | | 108,245 | 5,380 | | $108,245 | 19,620 | 32,120 | | $629,873 |
| Hatfield | 29-Nov-04 | (t) | 200,000 | $2.0000 | 400,006 | 19,881 | 20.1200 | $400,006 | 180,119 | 180,119 | 19.6100 | 3,532,134 |
| Hatfield | 28-Dec-04 | (u) | 100,000 | $1.9995 | 199,954 | 10,574 | 18.9100 | $199,954 | 89,426 | 24,426 | 19.7566 | 482,575 |
| Hatfield | 28-Dec-04 | (w) | | | | | | | | 65,000 | 19.6464 | 1,277,016 |
| Hatfield | 29-Dec-04 | (x) | | | | | | | | | | |
| **Hatfield Total** | | | 300,000 | | 599,960 | 30,455 | | $599,960 | 269,545 | 269,545 | | $5,291,724 |
| Brooks | | | 3,875,000 | | $4,129,509 | 205,244 | | $4,129,509 | 3,669,756 | 9,498,025 | | 185,903,322 |
| Schlegel | | | 205,000 | | 563,239 | 27,994 | | 563,239 | 177,006 | 149,503 | | 2,931,754 |
| Krantz | | | 100,000 | | 298,239 | 14,823 | | 298,239 | 85,177 | 116,226 | | 2,251,557 |
| Chasin | | | 50,000 | | 70,500 | 3,504 | | 70,500 | 46,496 | 108,486 | | 2,062,930 |
| Nadelman | | | 100,000 | | 329,485 | 16,376 | | 329,485 | 83,624 | 102,374 | | 2,007,554 |
| Berkman | | | 25,000 | | 108,245 | 5,380 | | 108,245 | 19,620 | 32,120 | | 629,873 |
| Hatfield | | | 300,000 | | 599,960 | 30,455 | | 599,860 | 269,545 | 269,545 | | 5,291,724 |
| | | | 4,655,000 | | $6,099,178 | 303,778 | | $6,099,178 | 4,351,224 | 10,276,279 | | $201,078,715 |

12/7/2005 7:44 AM Schedule1.xls



Home » Industries » War & Disaster Profiteering » US: The Rise and Fall of a War ...

✉ E-mail Page
🖨 Printer Safe

**Search CorpWatch**

Search Site | Search

Donate Now!

## US: The Rise and Fall of a War Profiteer

by Sarah Anderson, AlterNet
July 13th, 2006

In November 2005, bulletproof vest maker David H. Brooks made national headlines when he blew a pile of his war windfalls on a celebrity-studded bash in New York City's Rainbow Room. For Brooks, the highlight of the $10 million gala was a performance by rockers from Aerosmith. So pumped was the middle-aged Long Island businessman that he reportedly donned a hot pink, metal-studded suede pantsuit to cavort onstage with Steven Tyler.

While Brooks was enjoying his rock star fantasy, dark clouds were forming over him and his company, DHB Industries. The stock was in the toilet, the Securities and Exchange Commission was investigating him, and then there was the mood-killing matter of the military recalling his company's bulletproof vests over concerns about their bulletproofness. In hindsight, the pink-suited Brooks showed all the symptoms of a man who feared his partying days were numbered.

And indeed, as of this week, his reign as America's most ostentatious war profiteer does appear to be over. On July 10, the DHB Board of Directors issued a terse statement to the effect that Brooks had been put on indefinite "administrative leave" pending the outcome of unspecified investigations.

The Justice and Defense Departments are jointly investigating Brooks for possible criminal fraud and insider trading. The SEC had already been looking into the company in response to shareholder lawsuits charging that DHB execs carried out a "pump-and-dump" scheme to artificially inflate profits before selling off a boatload of their stock in 2004. Brooks personally sold about $186 million worth, shortly before the share price plummeted from about $22 to around $10. Today it's selling over the counter for less than $1. The company was booted from the American Stock Exchange last month for blowing off reporting deadlines.

Getting shoved out of a company you named after yourself has gotta sting. But Mr. DHB's forced vacation hardly makes up for the troubles he's caused shareholders, taxpayers and soldiers as he capitalized on the "War on Terror."

The war has been very good to Brooks. In the early 1990s, he was running a small brokerage business with his brother until the SEC temporarily barred him in 1992 over insider trading violations. Seeking a new line of work, Brooks turned his attention to a small body armor company he'd purchased for $800,000 from a firm on the verge of bankruptcy. His fortunes turned dramatically in the lead-up to the Iraq war, when Brooks successfully lobbied for an exclusive contract to make the vests used in the body armor now issued to every U.S. soldier in Iraq. The Pentagon's largese boosted DHB's stock, which in turn sent Brooks' pay, including stock options, skyrocketing, from $525,000 in 2001 to $70 million dollars in 2004.

Jim Magee, a retired Marine colonel and former head of DHB's Point Blank subsidiary, recently told the Washington Post that by hiring only DHB, rather than spreading the work around to the 20 or so qualified companies, the military created a bottleneck that kept many troops in Iraq from having state-of-the-art body armor until nine months after the war began.

Eventually, the Pentagon broke DHB's monopoly to speed up production, but that wasn't the end of the military's problems with the company. Over the course of 2005, the Marines and Army recalled a total of 23,000 vests – all of them produced by DHB – after an investigation by the Marine Corps Times revealed that the vests had failed ballistics tests for stopping 9 mm bullets. The exposé showed that Pentagon officials had dismissed repeated warnings by inspectors. In one instance, army ballistics expert James Macklewicz alerted higher-ups of "major quality assurance deficiencies" by DHB and recommended rejecting certain lots of vests and "disciplinary action against the contractor."

The military maintains that the recall was merely to calm fears stoked by the Marine Corps Times exposé -- fears they claim are unfounded because subsequent tests on a sample of the vests found nothing wrong. And while there were rumors that the Pentagon Inspector General's office might conduct an investigation into the faulty vest affair, to date there is no sign that one is underway. Instead, the Defense Department is focusing on alleged financial wrongdoing at DHB -- a matter further from their own hands.

And so like Al Capone and his tax evasion and Augusto Pinochet and his money laundering, David H. Brooks' downfall will likely have more to do with financial hanky-panky than the possibility that troops were killed because of his company's shoddy vests.

Congress could do something to get to the bottom of the DHB vest affair. Back in World War II, when Harry S. Truman was still a Senator, he made his name by leading a special investigative committee to go after war profiteers. A comparison between one of their most significant investigations and the handling of the DHB case illustrates why we need a modern-day Truman Committee.

In 1943, Truman's team began getting tips that aerospace firm Curtiss-Wright was delivering defective motors to the

**Company Profiles**

Boeing
Lockheed Martin
Northrop Grumman
General Dynamics
Raytheon
United Technologies
Halliburton
General Electric
Science Applications International Corporation
CSC/ DynCorp

**News**

KATRINA: Hurricane Victims Say Agents Advised Against Flood Coverage

US: The Rise and Fall of a War Profiteer

IRAQ: Army to End Expensive, Exclusive Halliburton Deal

KATRINA: First trial of insurance lawsuit set to open

KATRINA: 'Breathtaking' Waste and Fraud in Hurricane Aid

More »

**Join War Profiteers List**

Send

Case 2:05-cv-04345-JS -ETB   Document 170   Filed 09/21/07   Page 20 of 20
CorpWatch : US: The Rise and Fall of a War Profiteer

Page 2 of 2

Air Force. As in the DHB case, military officials denied the accusations. But Truman and his gang didn't stop there. They took testimony from company employees and military officials that revealed Curtiss-Wright had indeed sold leaky motors to the government and covered it up with forged inspection reports. The military had protected the company by removing inspectors who attempted to block the flawed parts from being installed in airplanes and endangering lives.

We could use a spunky investigator like Harry Truman today. According to a top expert on war-time contracts, Charlie Cray of the Center for Corporate Policy, the DHB case is just one of many that deserve lawmakers' attention. He pointed to the Pentagon Inspector general's admission that the military has failed to account for $8.8 billion in Iraqi reconstruction funds as evidence that we haven't yet scratched the surface of the "war profiteering iceberg."

Keith Ashdown, of Taxpayers for Common Sense, agrees that more oversight is needed. "If contractors knew that they could be called before a committee of some stature, be publicly embarrassed and have their career destroyed, it could be a powerful deterrent."

The Truman Committee held 432 hearings with 1,798 witnesses and issued 51 reports. By contrast, today's lawmakers have held only a few hearings on Iraq war contracts. The DHB vest affair appears to have come up only once – when Mississippi Democrat Gene Taylor tried unsuccessfully to get Undersecretary of Defense Ryan Henry to comment on the matter.

There are bipartisan bills in both the Senate and the House to create a modern-day Truman Committee, but so far they have failed to muster support from more than a few Republicans. When the proposal last came up for a vote in the Senate, it went down on straight party lines.

The partisan divide over war profiteering is good news for all the David H. Brooks wannabes out there eager to make a profit off a War on Terror with no end in sight. While it is heartening to imagine that Brooks might have to exchange his pink rock star costume for an orange jumpsuit, this image shouldn't overshadow the bigger problems with contractor accountability. Case in point: while Brooks' personal fortunes may have soured, the company remains in good standing with Pentagon procurement officers. DHB raked in a total of $145 million in defense orders in 2005 and announced its most recent body armor contract for $12.2 million on May 5, 2006.

*Sarah Anderson is a Fellow of the Institute for Policy Studies in Washington, DC, and the co-author of a forthcoming report on CEO pay in the defense and oil industries, "Executive Excess 2006," to be released on August 29.*

This site contains copyrighted material the use of which has not always been specifically authorized by the copyright owner. We are making such material available in our efforts to advance understanding of environmental, political, human rights, economic, democracy, scientific, and social justice issues, etc. We believe this constitutes a 'fair use' of any such copyrighted material as provided for in section 107 of the US Copyright Law. In accordance with Title 17 U.S.C. Section 107, the material on this site is distributed without profit to those who have expressed a prior interest in receiving the included information for research and educational purposes. For more information go to: http://www.law.cornell.edu/uscode/17/107.shtml. If you wish to use copyrighted material from this site for purposes of your own that go beyond 'fair use', you must obtain permission from the copyright owner.

1611 Telegraph Avenue., #720 l Oakland, CA 94612 USA l 510-271-8080                    Design by Tumis.com l Powered by RadicalDesigns.org